## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK MAXSON, | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| JAMES DWYER, JOHN DUFFY, | ) | No. |
| WILLIAM MARLEY, ANGELO | ) | |
| PESAVENTO, and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES the Plaintiff, MARK MAXSON, by and through his attorneys,

ELLIOT R. ZINGER, Esq., and LARRY M. DREYFUS, Esq., and presents his Complaint

pursuant to 28 U.S.C. § 1983, and in support thereof, states as follows:

## INTRODUCTION

Mark Maxson has spent the past 24 years in prison because of the egregious and criminal

conduct of Chicago Police officers who worked under the supervision, direction and command of

Jon Burge at Area 2 Headquarters in Chicago. Mark Maxson is one of hundreds of African

American men in Chicago who were tortured into giving false confessions by Burge era officers.

The pattern and practice of torture was so widespread and pervasive that it is has been, in the

words of Federal District Court Judge Milton Shadur, "common knowledge" (for now decades).

*See infra*, *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999).

Stories of exoneration of such torture victims have appeared in the media so frequently that

many of us have become desensitized to their impact upon us as a civilized society as well as to

1

their historical significance. Even amidst all of these highly publicized exoneration cases, Mark Maxson's case is both unique and quite simply, astonishing.

In 1994, Mark Maxson was convicted of the brutal stabbing murder and sexual assault of 6 year old Lindsey Murdock based upon a false confession that was forcefully extracted from him at Area 2 headquarters. That storyline we have heard before. What makes Maxson's case unique, however, is that *he was the one who originally came forward* to the police *and to the news media* in order to assist in the apprehension of Lindsey's shockingly violent offender. The second unique factor in Maxson's case was that while in the police station "assisting the police", a rightfully confused Maxson voluntarily gave blood and hair samples at the request of the detectives. Then, after allegedly providing vivid details of this horrible crime, Maxson insisted that it be inserted into "his" court reported statement that he was giving the samples "*in order to clear myself.*" Maxson refused to sign the court reported statement. Finally, at Maxson's trial, the State's scientific witnesses testified that the blood and pubic hair samples recovered from the victim *did not match Mark Maxson or the child's blood or hair*. Otherwise stated, the police and prosecutors were always aware that an unidentified third party was involved in the murder. That, of course, did not deter them from prosecuting Maxson.

Amidst rampant publicity and community pressure, the police needed to solve this crime in order to pretend that they were doing their job and to assure the public that they were now safe. And like in so many other notorious cases, better to swiftly solve a murder by taking a false confession from an innocent man than to leave a case open and perhaps forever unsolved. In this case, *a child rapist and killer was left to wander the Chicago streets* in the Roseland community while Mark Maxson languished in custody. Some two years later, the actual murderer struck

again, brutally stabbing to death another victim in the same community. For decades, police, prosecutors and public officials were fully aware of this pattern and practice of violence and injustice towards the African-American community, and did nothing to stop it. To the contrary, in the face of all of the evidence, many denied, and to this day still deny, that it ever occurred.

Mark Maxson, through this lawsuit, seeks compensatory and punitive damages for the grievous injuries inflicted upon him from the persons and public entities responsible for this horrible miscarriage of justice.

## I. JURISDICTION AND VENUE

1. This is a civil rights action brought pursuant to: 42 U.S.C. § 1983 et seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein

## II. PARTIES

3. Plaintiff Mark Maxson is an African-American man, and a citizen of the United States.

4. Defendant JAMES DWYER was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

5. Defendant JOHN DUFFY was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

6. Defendant WILLIAM MARLEY was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

7. Defendant ANGELO PESAVENTO was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

8. Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the Chicago Police Department, its Office of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his office, and his City Council, the Corporation Counsel's Office, and the Chicago Police Board. The City of Chicago is and/or was the employer of each of the Defendant Officers. The City of Chicago is responsible for the acts of the

Defendant Officers while employed by the City of Chicago and while acting within the scope of their employment.

9. At all times relevant to this complaint, each of the named Defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois. The individual Defendants' actions constituted "state action" as defined under federal law.

### III. STATEMENT OF FACTS

**A. IN 1992, PLAINTIFF WAS DETAINED, ARRESTED AND FORCED TO CONFESS TO A HORRIBLE SEXUAL ASSAULT AND MURDER THAT HE DID NOT COMMIT. BASED SOLELY UPON SUCH FALSE CONFESSION, PLAINTIFF WAS CONVICTED AND HAS SPENT THE PAST NEAR QUARTER OF A CENTURY INCARCERATED.**

10. On August 31, 1992, Plaintiff was unlawfully seized by detectives of the Chicago Police Department and detained under color of law and without due process for a period of three days at the Area 2 Chicago police station at 111th & Ellis in Chicago, Illinois.

11. It was Plaintiff himself who first contacted the police when he attempted to assist in the murder investigation of the six (6) year old child/victim Lindsey Murdock. Plaintiff provided information to a local TV news station covering the story that he had seen the victim the day before in the neighborhood.

12. Defendant Detectives Angelo Pesavento and William Marley lured the Plaintiff into going to the Area 2 Chicago police station at 111th & Ellis, by assuring him that "it wouldn't take long." They had no leads or suspects at that time.

13. The detectives involved in Plaintiff's unlawful seizure, detention and ultimately, his false and coerced confession, were: William Marley; Angelo Pesavento; James Dwyer and John Duffy.

14. Once at the station, Defendants Pesavento and Marley interrogated Plaintiff numerous times and left him in a locked room.

15. Defendant, John Duffy, James Dwyer, Angelo Pesavento and William Marley were all directly involved in the detention and interrogation of the Plaintiff. Duffy and partner Dwyer interviewed Plaintiff approximately 4-5 times.

16. Defendant John Duffy threatened Plaintiff in the police station as follows… "Mother-fucker, if you don't cooperate with us, we're going to kick your ass."  Det. Pesavento interrogated Plaintiff shortly after such threats were made by Duffy.

17. Both Duffy and Dwyer denied Plaintiff's requests for an attorney and proceeded with their coercive interrogation.

18. Defendant James Dwyer was especially instrumental in coercing Plaintiff's confession by his repeated threats, slapping, kicking the wind out of him, and ultimately, by pointing his handgun at the Plaintiff, while he was in custody at Area 2.

19. Upon information and belief, Detectives John Duffy, Angelo Pesavento and William Marley were in close proximity to the Plaintiff during his interrogation process and they knew, or should have known, of the above stated physical abuse endured by Plaintiff.  Yet, Duffy, Pesavento and Marley did nothing to stop such physical abuse.

20. Defendant Duffy gave false testimony at Plaintiff's Motion to Suppress Statements, when he testified that Plaintiff was never threatened with a physical beating. Further, Defendant

Duffy testified falsely at said Motion that Plaintiff was never kicked, slapped or threatened with a handgun.

21. Defendant Pesavento falsely testified at said Motion that Plaintiff was never threatened or struck before implicating himself in the murder. Defendant Dwyer similarly testified falsely that Plaintiff was never threatened, struck or assaulted with a handgun. Further, Dwyer falsely testified that Maxson never requested to leave the police station.

22. Detectives Dwyer, Duffy, Pesavento and Marley never informed the responding Assistant State's Attorneys of the Felony Review Unit of the abuse that was inflicted upon Plaintiff at Area 2.

23. Since the time of trial, newly discovered evidence has arisen that Area 2 detectives, under the supervision of Jon Burge, have documented histories of abusing arrestees in their custody, and/or knowing of such abuses but remaining silent of the abuses, and/or having taken the 5th Amendment when called upon to testify concerning these abuses.

24. This newly discovered evidence documents a pattern and practice by Area 2 Chicago Police detectives of abusing arrestees, during the Jon Burge reign of terror on the Southside of Chicago.

25. These detectives, along with the prosecutors assisting them, when deciding whether to arrest Plaintiff, were fully aware that Plaintiff added to his confession that he voluntarily provided hair and blood samples in order, *in his own added words*… "to clear myself."

26. At trial, the State's forensic experts testified that the Plaintiff's blood and hair samples *did not match* any blood or hairs found on or about the victim.

27. The detectives cited above were fully aware that there was no physical evidence, eyewitness testimony or even circumstantial evidence against the Plaintiff.

28. The only evidence against the Plaintiff was his court reported "confession," which Plaintiff, in which he added that he was trying to *clear himself,* and which he *refused to sign*.

29. Given the detectives involved in Plaintiff's interrogation now well documented history of torturing other suspects during the Jon Burge era, the credibility of Plaintiff's "confession" is severely undermined.

30. Further, the believability of said confession is also severely undermined by Plaintiff stating in his alleged own "confession" that he had given blood and hair samples because he was attempting *"to clear myself"* and in his *refusal to sign* such court reported document.

31. Plaintiff has consistently maintained throughout his criminal litigation process for the last 24 years that the only reason he gave any inculpatory information at the police station was because he was threatened, assaulted and beaten by the detectives.

32. Prior to his trial, Plaintiff testified at his Motion to Suppress Statements that he voluntarily accompanied the detectives to the Area 2 police station but did not wish to remain there, locked up in a room with only a steel bench for three (3) days.

33. Defendant Duffy testified falsely at said Motion to Suppress Statements that Plaintiff willingly spent night(s) in the interview room, although there was no bed or cot to sleep on in said room. Maxson testified that both Dwyer and Duffy told him he could not leave the station, regardless he was not under arrest.

34. Prior to his trial, Plaintiff testified at his Motion to Suppress Statements that he was beaten and threatened in the manner described in this Complaint.

35. Such Motion was denied, largely because the Court was unaware of the pattern and practice of torture at Area 2 headquarters due to a conspiracy between police, prosecutors and public officials to conceal such torture practices in order to obtain criminal convictions.

**B. EXPERT FORENSIC TESTIMONY OFFERED BY THE STATE AT PLAINTIFF'S CRIMINAL TRIAL ACTUALLY EXCLUDED MAXSON AS THE PERPETRATOR AND POINTED TO AN UNIDENTIFIED THIRD PARTY. NOW, AFTER RECENT DNA TESING HAS BEEN CONDUCTED, THE IDENTITY OF SUCH THIRD PARTY HAS BEEN ESTABLISHED.**

36. As indicated, except for Maxson' coerced confession, the State failed to produce any evidence that Maxson participated in, or was in any way associated with, the horrible murder of child/victim Lindsey Murdock.

37. At trial, State Witness and Serologist Therese Ann Finn testified that she examined blood found on a mirror recovered from the scene and determined that it belonged to child/victim Lindsey Murdock.

38. Lindsey's shirt, Finn testified (which was found in the garage), had bloodstains on it that matched Lindsey's blood. Further, Finn testified that the shirt also had bloodstains that were *inconsistent with either Lindsey's or Maxson's blood. Blood on Lindsey's hand did not match that of either Lindsey or Maxson.*

39. At trial, State Witness and Criminalist James Berk testified that he analyzed head and pubic hair samples taken from Lindsey's clothing and found that they *did not match the characteristics of either Maxson's or Lindsey's hair.*

40. Now, some 25 years later, recent DNA testing has revealed that DNA belonging to one Osborne Wade was found to be mixed with child/victim Lindsey Murdock's blood. This recently identified individual is a convicted murderer, having pled guilty to stabbing another

individual to death *approximately two years after Lindsey Murdock's murder*. Further, investigation has revealed that at the time of Murdock's stabbing murder, Wade *lived in very close proximity the murder scene*, i.e., the garage where young Lindsey's body was recovered under a pile of debris.

41. On September 27, 2016, upon motion by the Cook County State's Attorney Anita Alvarez, through her Conviction Integrity Unit, an Order was entered by the Honorable Judge Thaddeus L.Wilson vacating the judgment of conviction against Maxson and ordering his immediate release from the Illinois Department of Corrections. *See* **GROUP EXHIBIT A,** STATE'S PETITION FOR RELIEF FROM JUDGMENT and ORDER.

42. On or about September 27, 2016, Wade was indicted by the Cook County Grand Jury for the murder of Lindsey Murdock. Wade has given a videotaped confession to the police and the FBI regarding his commission of said horrible crime for which Maxson was wrongfully convicted and spent nearly a quarter of a century languishing in prison..

**C. MAXSON'S CONSISTENT CLAIMS SINCE THE TIME OF HIS ARREST THAT HIS CONFESSION WAS FALSE AND COERCED IS SUBSTANTIATED BY NEWLY DISCOVERED EVIDENCE THAT AREA 2 DETECTIVES WERE ENGAGED IN A PATTERN AND PRACTICE OF TORTURE SO AS TO EXTRACT FALSE CONFESSIONS IN MURDER CASES.**

43. The detectives and their supervisors involved in Maxson's case have long histories of physically and psychologically abusing suspects by either direct participation and/or silent acceptance of what they knew or should have known what was occurring at Area 2. Until recently, however, allegations of such torture were routinely ignored.

44. Newly discovered evidence gives new meaning to Maxson' claims and shows a pattern of abuse that makes the truth of his allegations indisputable.

45. This is especially so given the lack of any other evidence in Maxson's case; his refusal to sign the "confession; his attempting to "clear himself" of a horrible murder while supposedly confessing. These facts are simply bolstered the recent identification of the actual killer.

46. While the revelation of the Chicago police torture began in the early 1990s, it is only within the last few years that the extent of the torture and the identities of many of the offending officers have been fully explored. This process began in 1990, when the Office of Professional Standards ("OPS") for the Chicago Police Department issued two "Special Project Conclusion Reports," the "Goldston Report" and the "Sanders Reports". These reports detailed the excessive force Chicago police officers inflicted on Andrew Wilson in 1982 and the greater systematic abuse at Area Two during that time. The Goldston report concluded:

> In the matter of alleged physical abuse, the preponderance of the evidence is that ***abuse did occur and that it was systematic***. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating but went into such esoteric areas as psychological techniques and planned torture. (emphasis added).

47. As referenced above, *in 1999*, U.S. District Judge Milton I. Shadur found that it was *undisputed* that Chicago police officers tortured suspects and obtained false confessions around the time that Maxson was arrested:

> It is now ***common knowledge*** that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him ***regularly engaged in the physical abuse and torture of prisoners to extract confessions***. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that ***those beatings and other means of torture occurred as an established practice, not just on an isolated basis***. *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999). (emphasis added).

48. In response to mounting public outcry and a petition requesting an investigation into the many allegations of torture, Paul Biebel, the Presiding Judge of the Criminal Division of Cook County Circuit Court, launched an investigation in 2002 into the many claims of torture at the hands of Chicago police officers.

49. Judge Biebel appointed Edward J. Egan and James D. Boyle as Special Prosecutors to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by the Chicago police officers under the command of Burge at Area Two and Area Three Headquarters in Chicago, beginning in 1973.

50. The resulting Report, released in 2006, highlighted a large number of torture claims and identified many officers, who were accused of physical and psychological abuse of individual in police custody.

51. Maxson has consistently maintained that the detectives in his case physically and psychologically abused him and coerced him into giving a false confession. The cases below detail chillingly similar claims of abuse leveled against all of Maxson's detectives.

52. Defendant William Marley has been directly involved in many notorious cases involving Jon Burge and other Area 2 detectives. See, e.g., *People of the State of Illinois v. Aaron Patterson, 192 Ill.2d 93 (2000);(1986* false confession procured by Marley, Burge, Pienta and McWeeney, and others. On January 10, 2003, Patterson was granted a gubernatorial pardon based on innocence by Governor George H. Ryan. In 2007, a federal civil rights suit brought against the police by Patterson was settled for $5 million.

53. Marley and Pienta were also involved in the wrongful conviction of Patterson's co-defendant, Eric Caine. *People of the State of Illinois v. Eric Caine. (People v. Caine, 258 Ill. App.*

*3d 599).* Pienta brought Caine into Patterson's interrogation room and struck Caine in the chest, warning him that he would get the same treatment as Patterson unless he was "cool." Caine spent the night locked in an interrogation room at Area Two headquarters.While interrogating Caine the next day, Madigan, a detective in the case, began describing the murders. For a long period of time, while Caine remained silent, Madigan repeated key points of the confession that he wanted Caine to recite. Shortly thereafter, Madigan presented Caine with his notes for Caine to study and so that he could sign them as his own statement. When Caine refused to sign the false confession, Madigan struck Caine with a cupped hand on the side of his head. Caine heard a loud pop and felt a rush of pain. Caine cried out and doubled over in agony, as Madigan tried to quiet him. The strike to Caine's head ruptured his eardrum. On March 16, 2011, 25 years after his conviction, the State of Illinois dismissed all charges against Caine and Cook County Circuit Court Judge William Hooks ordered his release. In July 2013, Caine settled a federal lawsuit against the Chicago Police Department for $10 million.

54. In 1990, Defendants Marley, Duffy, Dwyer and fellow longtime Burge subordinate Pienta were all involved in the Area 2 torture of Shawn Whirl. *People v. Whirl*, 2015 IL App (1st) 111483. After Duffy and Dwyer interviewed Whirl, they left him in an interview room for Pienta, who tortured Whirl into a false confession. Pienta slapped Whirl as he repeatedly denied involvement in the murder. Noticing Whirl had a wound on his leg, Pienta then stepped on Whirl's foot and scraped the wound on his leg with a key until a false confession was obtained. Whirl was granted a new trial in 2015, released shortly thereafter and now has a pending 1983 claim for the torture inflicted upon him.

55. In *People v. Baker*, 253 Ill. App. 3d 15 (1st Dist. 1993), the Appellate Court reversed a murder conviction holding that detectives James Pienta and William Marley, in 1986, improperly reinitiated contact with a mentally ill defendant after he had invoked his fifth amendment right to counsel.

56. In *People v. Everett*, 228 Ill. App. 3d 1054 (1st Dist. 1992) Everett alleged that during questioning for a 1987 murder by Detective Defendant John Duffy, he was not allowed to use the bathroom, drink water or contact his attorney. He claimed that the officers did not allow him to telephone his attorney because he refused to give a statement. Questioning ceased sometime between 5 and 6 p.m., and Everett was then taken to lock-up. Defendant alleges that he was not given any food. He also alleges that he was not allowed to make a telephone call until 1 a.m. the next morning.

## D. THE TORTURE, ARREST, WRONGFUL CONVICTION AND INCARCERATION OF MARK MAXSON COULD NOT HAVE BEEN ACCOMPLISHED WITHOUT THE DIRECT ASSISTANCE AND KNOWLEDGE OF A LARGE NUMBER OF UNSUED CO-CONSPIRATORS WHO FOR DECADES, BY THEIR ACTIONS AND INACTIONS, RATIFIED THE BEHAVIOR DESCRIBED IN THIS COMPLAINT.

57. From 1981 through 1989 unsued co-conspirator Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of that office. From 1989 to 2011, Daley was the Mayor of the City of Chicago and as such was a chief policymaker for the City of Chicago, its Police Department, City Council, and Police Board and was and is therefore responsible for the policies, practices, and customs complained of herein.

58. From 1982 through August of 1986, unsued co-conspirator Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and was, the commanding officer of Chicago

Police Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3 Detective Division by Superintendent Leroy Martin and held this assignment until November of 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for the torture and abuse of Andrew Wilson. Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to Area 2 detectives named herein. On June 28, 2010, Burge was convicted of perjury and obstruction of justice for falsely denying that he participated in, was aware of and supervised police torture.

59. Unsued co-conspirator John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to August of 1986, and supervisor of the Unit's notorious midnight shift, also known as the 'A Team," who also worked on the midnight shift of the Area 2 Violent Crimes Unit. Byrne, like Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives.

60. In 1983 and early 1984 , unsued co-conspirator Leroy Martin was the Commander of Area 2 and Jon Burge's direct supervisor, and from 1987 to 1992, he was the Superintendent of Police for the City of Chicago, and as Superintendent was responsible for the policies, practices, and customs complained of herein.

61. From 1990 to 1998, unsued co-conspirator Gayle Shines was the Director of the Office of Professional Standards of the Chicago Police Department, appointed by Mayor Richard M. Daley. As such, she implemented the policies, practices and customs of the CPD with regard to discipline. Her direct supervisor was the Chicago Police Superintendent.

62. From 1998 to 2004, unsued co-conspirator Terry Hillard was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein.

63. From 1998 to 2002, unsued co-conspirator Thomas Needham was counsel to, and administrative assistant for, Superintendent Terry Hillard, who was his direct supervisor, and, as such, implemented the policies, practices and customs alleged herein.

64. In February 1982, the Superintendent of the Chicago Police Department, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African-American citizens, including Donald White, Anthony Williams, Lamont White, Walter White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and abused and terrorized a large number of other African-American citizens.

65. In the early morning hours of February 14, 1982, Burge and numerous Area 2 detectives, arrested Andrew Wilson for the police officer murders.That morning and throughout that day, Burge and other Area 2 detectives tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears, and other parts of the body with a black electric shock box and a plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating. States Attorney Daley, the then Mayor of the City of Chicago Jane Byrne, and the then Superintendent of the Chicago Police all closely monitored developments in the manhunt. All three learned from numerous sources about the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and his brother Jackie Wilson, and

did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

66. As a direct and proximate result of the failure of Daley, Leroy Martin and their successors to intervene, to discipline and to adequately supervise, Burge and other Area 2 Detectives tortured numerous additional almost exclusively African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of 1982 to April of 1990. The victims in this period included the following men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Bobby Joe Williams, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Lee Norah, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, James Billingsley, Stanley Howard, Dwight Cavin, Alphonso Pinex, Thomas Craft, Lavert Jones, Alex Moore, Terry Harris, Lonza Holmes, Mearon Diggins, Michael Tillman, Stephen Bell, Eric Caine, Aaron Patterson, Darrell Cleveland, Terrence Houston, David Randle, Richard Terrell, Andrew Maxwell, Jerry Thompson, Donald Torrence, Madison Hobley, Jeffrey Howard, Curtis Milsap and Ricardo Rodriguez.

67. Defendant detectives in Plaintiff Maxson's case concealed from Plaintiff and his counsel, the trial, appellate and post-conviction prosecutors, and the judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men. Defendant detectives also concealed the physical implements of the pattern and practice of torture, including cattle prods, electric shock box, plug-in electrical device, plastic bags, typewriter covers, blackjacks, rubber truncheons, telephone books, shotguns and handguns

used by Burge and other Area 2 detectives against numerous other victims of their pattern and practice of torture.

68. By no later than February 1982, co-conspirator Daley had direct, personal knowledge that Defendant Burge and other Area 2 detectives committed acts of torture against African American suspects at Area 2. During the February 1982 manhunt described above, Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2. Daley therefore knew or should have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular, the abuse of the White brothers and Anthony Williams, who were placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Burge and his men perpetrated against them.

69. Co-conspirator Richard M. Daley was also informed of the arrests of Andrew and Jackie Wilson on the morning of February 14, 1982. Throughout the day of February 14, as the Wilsons were tortured (frequently screaming in the course of the abuse), several high ranking Assistant State's Attorneys were present at Area 2. An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, Larry Hyman, participated directly in the interrogation of the Wilsons, which occurred between sessions of torture at the hands of Burge and his men. The high ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that the Wilsons were being tortured. Those high ranking assistants were reporting directly to Daley and to the First Assistant State's Attorney at the time, Richard Devine. Neither Daley nor any of his top assistants did anything to halt or prevent the torture of the Wilsons.

70. On or about February 17, 1982, Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that the medical examination of Andrew Wilson revealed unmistakable evidence that Wilson had been brutalized while in police custody, and that Wilson reported being tortured with electric shock. In this letter, Dr. Raba demanded an investigation. After conferring with high ranking police command personnel, the Superintendent wrote a letter to unsued co-conspirator Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of Wilson, the Superintendent would not investigate or otherwise pursue the matter without instructions from Daley.

71. Co-conspirator Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant and other high level subordinates. Daley never responded to the letter.

72. Daley and his subordinates were fully aware that Superintendent Brzeczek's letter set forth criminal conduct by Burge and other Chicago police detectives and officers, and they knew or should have known that ASA Larry Hyman might be complicit in this criminal conduct. They also knew that there was physical, medical, and testimonial evidence which supported the claim of physical abuse.

73. Not only did Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation. Instead, on information and belief, Daley communicated to Dr. Raba, through Cook County Board President

George Dunne, that Raba "should not get involved" in the Wilson case, and subsequently, both Daley and the Superintendent issued separate public commendations to Burge and his men.

74. As a direct result of co-conspirator Daley's refusal to act, the Chicago Police Department, and its Office of Professional Standards indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Wilson and Raba, and by the other African American citizens who were tortured and abused during the manhunt.

75. Throughout the manhunt, the arrests first of the White brothers then of the Wilson brothers, the receipt and discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

76. This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Daley, no longer exists, and, on further information and belief, was destroyed by Daley.

77. In the period of time between the Wilsons' torture, in February 1982, and when Daley left the Cook County State's Attorney's Office in December of 1988, Cook County prosecutors, under Daley's direction, prosecuted at least thirty African American men who were tortured by Defendant Marley and co-conspirators Burge, Byrne, and other detectives under Burge and Byrne's command and supervision. In none of these cases did Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Andrew Wilson and the specific knowledge of Daley and his high ranking subordinates as to the

truth of Wilson's allegations. In none of these cases did Daley request or pursue an investigation into the allegations of torture.

78. Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the Cook County State's Attorney's Office prosecuted during this period of time. There is no more grave and important decision made by the State's Attorney of Cook County than the decision to seek the death penalty against an accused defendant. Each and every such decision was made personally by the State's Attorney himself after careful review of the case and full consultation with both his high command and the line assistants handling the prosecution.

79. Subsequent to seeking and obtaining the death penalty in Andrew Wilson's case, Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Reginald Mahaffey, Jerry Mahaffey, Michael Tillman, and Steven Bell,—all of whom claimed that they were tortured by Area 2 Lieutenant Burge, Midnight Sergeant John Byrne, Defendant Marley, and/or other Area 2 personnel. On information and belief, Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge, Byrne and/or other Area 2 personnel, in some cases using techniques identical or very similar to those Daley knew had been used against Andrew Wilson. Knowing that these individuals all credibly claimed that they had been tortured into confessing, Daley nonetheless decided to seek the ultimate punishment against each of them, in each case declining to pursue any investigation of the involved Area 2 officers and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

80. At the time Daley reviewed the cases set forth in paragraph 79 above and decided to seek the death penalty in each of those cases he (a) had near-certain personal knowledge that Andrew Wilson had been tortured and that numerous other African Americans had been tortured, abused, and terrorized by Burge and his men during the Wilson manhunt; (b) had personal knowledge that Burge and his Area 2 detectives were continuing to practice extreme physical abuse and torture against African American suspects; and (c) personally knew of exculpatory information regarding the pattern of torture, which he had deliberately concealed since February 1982. Daley nonetheless decided to seek the ultimate punishment against these African American men without pursuing any investigation of their allegations and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

81. Leroy Martin was the Commander of Area 2 in 1983 and early 1984, and was Burge's direct supervisor. At that time, Martin learned that his Violent Crimes Lieutenant Jon Burge, his Midnight Sergeant John Byrne, and detectives under their command, systematically tortured and abused numerous African American suspects, including Andrew and Jackie Wilson, Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton. Martin failed to initiate appropriate investigations or to discipline Burge, Byrne, Marley, or any other Area 2 officers in connection with any of these cases.

82. In 1987, Martin was named Superintendent of the Chicago Police Department. As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 Commander, Martin continued to fail to intervene, to supervise, discipline or otherwise act to

prevent the ongoing misconduct of Burge and his men. Following Plaintiff's torture and wrongful conviction, Martin worked actively to conceal and suppress evidence of the pattern of torture, as is fully alleged below.

83. Following his arrest in 1992 and his conviction in 1994, Plaintiff languished in prison until 2016, when he was exonerated after DNA testing revealed the identity of the actual murderer.

84. Plaintiff's exoneration was delayed and his imprisonment and wrongful conviction lasted far longer than it otherwise would have because, for many years, Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including Defendants Marley, Pesavento, Dwyer and Duffy and co-conspirators Burge, Byrne, their police confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

85. In 1989, co-conspirator Daley became the Mayor of the City of Chicago. In that capacity he was directly responsible for the appointment of the Superintendent of the Chicago Police Department. Daley also had ultimate responsibility for the operations of the Police Department. Daley therefore had the duty to take all necessary steps to ensure that the Department and its officers disclosed exculpatory information to all victims of co-conspirators Burge, Byrne, and their Area 2 confederates, including Defendant Marley. In addition, Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Daley had become personally aware while he was State's Attorney of Cook County.

86. Co-conspirator Daley, while Mayor 1) did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County, until he left the Mayor's office in 2011; 2) did not intervene at any time to direct the Chicago Police Department to disclose exculpatory information in its possession regarding Burge; and 3) did not direct the CPD to conduct a thorough and aggressive investigation of Burge, Byrne, Marley, and the other detectives who abused African American men while working under Burge's command.

87. Rather than disclose exculpatory material and conduct appropriate investigations, co-conspirators Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge. Their actions in this regard included, but are not limited to those alleged above and below.

88. In 1990 a report was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systematic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse, and encouraged it, by actively participating or failing to take action to stop it. In 1991, the Goldston Report was supplemented with a finding that Burge, Byrne, and several other Area 2 detectives were prime movers in this pattern of abuse, and that Burge and two of his subordinates had tortured Andrew Wilson.

89. In a companion Report, the "Sanders Report", the OPS found that Burge and these same two subordinates tortured Andrew Wilson and recommended that they be fired.

90. Co-conspirator Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing the findings that Wilson was tortured and

by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

91. Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing the findings that there was systematic abuse at Area 2, which implicated Martin, Burge, Byrne, and other Area 2 detectives who worked under Burge's command.

92. The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

93. On or before February 7, 1992, Mayor Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel. Daley knew or should have known that Martin had been the commanding officer at Area 2 and Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

94. Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Daley: 1) did not seek an independent federal investigation; 2) direct Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or 3) seek the prosecution of Burge and his confederates.

95. Instead, in a joint effort with Superintendent Martin, Mayor Daley sought to

publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was, *inter alia*, to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

96. Even after learning of the findings in the Goldston Report, Martin, OPS Director Gayle Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Defendant Burge.

97. From 1989 to 1992, Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

98. In January of 1992, Martin admitted in a publicly filed pleading that an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

99. In February 1993, the Chicago Police Board fired Burge for torturing Andrew Wilson. These findings became final in December 1995.

100. In 1993, the OPS re-opened investigations into approximately ten Area 2 torture cases. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations that

Sergeant Byrne and Area 2 Detective Peter Dignan racially abused and tortured Darrell Cannon with the cattle prod. OPS supervisor Carmen Christia reviewed the findings and approved them.

101. The OPS also entered sustained findings of torture and abuse against Byrne and Dignan in five other re-opened cases, including that of Gregory Banks and Stanley Howard.

102. From 1993 until 1998, co-conspirator Shines (who had previously been appointed by Mayor Daley) under pressure from her fellow co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

103. In 1998, co-conspirator Superintendent Terry Hillard and his administrative assistant Thomas Needham, with full knowledge that Area 2 detectives had participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate OPS Director Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

104. On information and belief, Daley also personally insisted, from the time he became Mayor in 1989 until he was succeeded in 2011, that the City of Chicago continue to finance the defense of Burge, Byrne and their accused colleagues and subordinates, despite his personal knowledge that they had committed acts of torture against African American men while employed as Chicago Police officers and/or supervised and condoned such acts. Daley's insistence on defending Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge, and continued throughout Daley's tenure as Mayor,

despite Burge's indictment in October of 2008 for perjury and obstruction of justice, and his conviction on these charges on June 28, 2010.

## E. PLAINTIFF'S CONVICTION WAS OBTAINED AND HIS ULTIMATE EXONERATION WAS DELAYED FOR DECADES DUE TO THE CONDUCT DESCRIBED IN THIS COMPLAINT.

105. The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly continued the wrongful conviction of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

106. On September 27, 2016, the prosecution dismissed all charges against Plaintiff in a manner indicative of innocence, and on that very same date, Plaintiff was released from prison.

## F. THE MISCONDUCT OF THE DEFENDANTS NAMED HEREIN WAS COMMITTED IN THE FURTHERANCE OF A CONSPIRACY TO TORTURE AFRICAN AMERICAN CITIZENS IN THE CITY OF CHICAGO AND TO GO TO GREAT LENGTHS TO CONCEAL SUCH CRIMINAL CONDUCT.

107. Defendants Dwyer, Duffy, Marley and Pesavento, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, including those specifically named as co-conspirators in this complaint, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights. This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below, and has continued to the present, as evidenced, *inter alia*, by the false testimony and statements denying torture given by these Defendants and their fellow officers; false statements and testimony

Burge, co-conspirator and former Area 2 detective Michael McDermott, and various other police and assistant state's attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in U.S. v. Jon Burge; and by false public statements concerning police torture made by, inter alia, coconspirators Daley, Burge, Byrne and Richard Devine, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment, and in June of 2010 in response to Burge's conviction, and in 2015 in response to the passing by the Chicago City Council of the Reparations Ordinance.

108. By and through the aforementioned overt acts, together with those set forth above, each and every defendant and co-conspirator jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived and continues to deprive Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement and imprisonment and the excessive use of force; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## G. PLAINTIFF HAS SUFFERED IMMEASURABLE DAMAGES AT THE HANDS OF THE NAMED AND UNNAMED DEFENDANTS WHO CONTRIBUTED TO HIS WRONGFUL INCARCERATION FOR A QUARTER OF A CENTURY.

109. Plaintiff spent 24 years in prison for a crime he did not commit. This time was emotionally, physically, and psychologically dehumanizing and debilitating and can not be given back to him. Plaintiff has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff has suffered numerous beatings and 24 years of hatred and

derision from other inmates after being wrongfully labeled by defendants as a child rapist and killer. Plaintiff also suffered from the loss of sustained contact with members of his family, and was prevented from holding gainful employment or pursuing educational opportunities outside of the penitentiary walls. He continues to live under the effects of his isolation, incarceration, and depression, and until his exoneration, under the stigma of his wrongful conviction. Additionally, Plaintiff suffered and continues to suffer, egregious pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and post traumatic stress disorder from his torture and abuse.

## COUNT I

 (42 U.S.C. § 1983 Claim for Deprivation of a Fair Trial and Wrongful Conviction)

110. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

111. In the manner set forth more fully below, Defendants Dwyer, Duffy, Marley and Pesavento, individually, jointly, and in conspiracy with each other and the other named and unsued co-conspirators, caused the wrongful charging, prosecution, conviction, and imprisonment of Plaintiff and the continuation of that wrongful conviction.

112. These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically coercing, constructing and/or fabricating the false and totally unreliable statements and admissions which formed the basis for Plaintiff's prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements and admissions were false, totally unreliable, constructed, fabricated and coerced; by suppressing, destroying and preventing the discovery and

development of additional exculpatory torture findings and other evidence, including, but not limited to, other acts of torture and abuse that they participated in, the instruments of torture, as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right not to be wrongfully convicted, as guaranteed by the U.S. Constitution.

113. Additionally and/or alternatively, Defendants Dwyer, Duffy, Marley and Pesavento failed to intervene to stop Plaintiff's wrongful prosecution and conviction and resultant imprisonment despite having the opportunity and duty to do so.

114. The actions and inactions of Defendants Dwyer, Duffy, Marley and Pesavento in depriving Plaintiff of his right not to be wrongfully charged, convicted and imprisoned, and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

115. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

WHEREFORE, Plaintiff demands judgment against Defendants Dwyer, Duffy, Marley and Pesavento for a sum of thirty-six million dollars in compensatory damages and eighteen million dollars in punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II

(42 U.S.C. § 1983 Claim for Coercive Interrogation)

116. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

117. The actions of Defendants Dwyer, Duffy, Marley and Pesavento, individually, jointly, and in conspiracy with each other and with unsued co-conspirator Jon Burge, in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during said interrogations, resulted in false, coerced, and fabricated admissions that were subsequently used against him in his criminal proceedings, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

118. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

119. The actions of Defendants Dwyer, Duffy, Marley and Pesavento and co-conspirator Burge, in using torture and other coercive techniques to interrogate Plaintiff, and/or in devising, encouraging, facilitating, condoning and permitting the use of said techniques, and failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Dwyer, Duffy, Marley and Pesavento for thirty-six million dollars in compensatory damages and eighteen million dollars in punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

(42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

120. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

121. Defendants Dwyer, Duffy, Marley and Pesavento, together with the named and other unsued coconspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

122. Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

123. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

124. Additionally or alternatively, Defendants Dwyer, Duffy, Marley and Pesavento, knowing that the above § 1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

WHEREFORE, Plaintiff demands thirty-six million dollars in compensatory damages and eighteen million dollars in punitive damages, jointly and severally, from Defendants Dwyer, Duffy, Marley and Pesavento, plus attorneys' fees, the costs of this action and whatever additional relief this Court deems equitable and just,

## COUNT IV

(42 U.S.C. § 1983 Monell Policy Claim Against the City of Chicago)

125. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

126. The actions of Defendants Dwyer, Duffy, Marley and Pesavento as alleged above were committed pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Chicago.

127. At all times material to this complaint, the Defendant City of Chicago through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or Corporation Counsel's Office had interrelated de facto policies, practices, and customs which included, inter alia:

a. conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Leroy Martin, Jon Burge and John Byrne at Area 2;

b. the filing of false reports, and giving false statements and testimony about said interrogations and confessions and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions,

34

pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 detectives;

c. the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

d. the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercively questioning or interrogating witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. This failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

e. the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or

fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal and civil cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques at Area 2 were employed. An egregious example of this code of silence in the torture cases is evidenced and was invoked in response to the Government's investigation and prosecution of Jon Burge and the investigation of other Area 2 officers under his command and supervision;

f. covering up and suppressing evidence and findings, refusing to properly investigate, arrest and charge, continuing to finance the defense of Jon Burge, and other Area 2 detectives and otherwise attempting to both publicly and judicially defend their actions even after Burge had been indicted and convicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2.

128. The pattern and practice of torture and abuse at Area 2, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 well before Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Jon Burge and Leroy Martin, and Burge's successor,

Phil Cline, as well as to former Chicago Mayors Jane Byrne and Richard M. Daley and their Chiefs of Staff, successive Police Superintendents, including Richard Brzeczek, Fred Rice, Leroy Martin, Matt Rodriguez, Terry Hillard, and Phil Cline, to the successive OPS Directors, including Gayle Shines, and Callie Baird, to various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, to the Chiefs of Detectives, including William Hanhardt and Terry Hillard, to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of the Plaintiff and other torture victims, and the denial of their full and fair access to the courts, inter alia, in the manner set forth in this complaint.

129. Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, inter alia, the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a moving force behind, and a direct and proximate cause of, the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

130. Additionally, the City of Chicago's said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Dwyer, Duffy, Marley and Pesavento who were involved in numerous other acts of torture and abuse, was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff.

131. Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental and police policymakers, acting in their official capacities, as set forth in detail in the facts above, including, but not limited to, successive Police Superintendents, including co-conspirators Leroy Martin and Terry Hillard, and their direct subordinates, including, but not limited to, Gayle Shines and Thomas Needham, and several Mayors, most notably Mayor Richard M. Daley, who continued to publicly both ratify, and deny his involvement in, said conduct until he left office in 2011, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for thirty-six million dollars in compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V

(State Law Claim for Malicious Prosecution)

132. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

133. Defendants Dwyer, Duffy, Marley and Pesavento individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these

same Defendants, individually, jointly, and in conspiracy, continued said prosecution, again without probable cause. As described above, said prosecution was ultimately terminated in Plaintiff's favor and in a manner indicative of his innocence. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands an award of compensatory damages and punitive damages against Defendants Dwyer, Duffy, Marley and Pesavento, the costs of this action, and such other and additional relief as this Court deems equitable and just.

## COUNT VI

(State Law Claim for Intentional Infliction of Emotional Distress)

134. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

135. Defendants Dwyer, Duffy, Marley and Pesavento individually, jointly, and in conspiracy, by, inter alia, torturing false admissions from Plaintiff and/or by failing to prevent or stop said torture, by constructing and fabricating admissions, and by procuring his prosecution, conviction, and lengthy imprisonment for a murder he did not commit by means of said false admissions, engaged in extreme and outrageous conduct. Additionally these same Defendants, individually, jointly, and in conspiracy with their named co-conspirators, inter alia, by fabricating, coercing, and suppressing other evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate or discipline the torturers, engaged in additional extreme and outrageous conduct.

136. Defendants Dwyer, Duffy, Marley and Pesavento intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

137. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was, and continues to be, injured, and has, and continues to, experience severe emotional distress, including nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, inability to focus or concentrate, and after 24 years of being subjected to beatings and ridicule during his incarceration as a wrongfully convicted child molester and killer, recurring fears and nightmares.

WHEREFORE, Plaintiff demands judgment against Defendants Dwyer, Duffy, Marley and Pesavento for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT VII

### (State Claim for Conspiracy)

138. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

139. Defendants Dwyer, Duffy, Marley and Pesavento, with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in, and continue to engage in, a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and/or continue said prosecution, and to intentionally inflict continuing severe emotional distress on Plaintiff.

140. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

141. Said conspirac(ies) and overt acts were, and are, continuing in nature.

142. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Dwyer, Duffy, Marley and Pesavento, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VIII

(State Law Respondeat Superior Claim)

143. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

144. Defendants Dwyer, Duffy, Marley and Pesavento were, at all times material to this complaint, employees of the Defendant City of Chicago.

145. Defendant City of Chicago, as principal, is responsible for the acts of its employee/ agents committed in the course of their employment.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT IX

(745 ILCS 10/9-102 and Common Law Claims Against the City of Chicago)

146. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

147. Defendant City of Chicago was the employer of Defendants Dwyer, Duffy, Marley and Pesavento at all times relevant and material to this complaint.

148. These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

Respectfully submitted by,

ELLIOT R. ZINGER, Esq. & LARRY M. DREYFUS, Esq.


By:   /s/ Elliot R. Zinger                              Dated: 9/30/16
         One Of Mark Maxson's Attorneys


By:   /s/ Larry M. Dreyfus                            Dated: 9/30/16
         One Of Mark Maxson's Attorneys


Elliot R. Zinger, Esq.
ELLIOT R. ZINGER P.C.
309 West Washington Street
Suite. 700
Chicago, Illinois 60606
(312) 782-946442
 Attorney No. 52885

And

Larry M. Dreyfus, Esq.
Attorney At Law
102 Camino Barranca
Placitas, NM 87043
312-787-5524
Attorney No. 23742