IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK MAXSON | ) | |
| | ) | No. 16 C 9417 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| The CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' PARTIAL MOTION TO DISMISS

Defendant City of Chicago, by its attorneys The Sotos Law Firm, P.C., and Defendants John Duffy, Angelo Pesavento and William Marley, by their attorneys Hale Law, LLC, move this Honorable Court pursuant to FED. R. CIV. P. 12(b) to dismiss Plaintiff's Complaint, and state:

## FACTUAL BACKGROUND[1]

Six-year-old Lindsey Murdock was murdered and sexually assaulted and left in an abandoned garage at 10730 South State Street in Chicago in August 1992. *People v. Maxson*, 285 Ill. App. 3d 585, 587 (1996)[2]. The body was first discovered on August 30, 1992. *Id.* Later that evening, Defendant Angelo Pesavanto learned that Plaintiff, Mark Maxson, was being interviewed by a local television station reporter and was telling the reporter that he had seen the young victim earlier in the day. *Id* (Complaint at ¶11). Pesavanto asked Maxson if he had information about the boy and whether he would be willing to help. *Id.* Maxson was eager to

---

[1] As they must, for purposes of this motion to dismiss only, defendants take as true plaintiff's well-pleaded allegations.
[2] "[A] court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curan*, 714 F.3d 432, 436 (7th Cir. 2013), *citing Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir. 2012); *Ennenga*, 677 F.3d at 773 (taking judicial notice of public record permissible on motion to dismiss).

1

help and was very cooperative with the police. *Id.* Maxson was brought to the Area 2 police station where he offered to help the police in their investigation. *Id.* Maxson even voluntarily gave blood and hair samples. (Complaint at pg. 2).

Despite his willingness to help the police, Maxson says the police mistreated him. Maxson was interrogated numerous times and left in a locked room. (Complaint at ¶14). Defendant John Duffy threatened to "kick [his] ass" if he would not cooperate, and Duffy and Detective James Dwyer denied his repeated requests for an attorney. (Complaint at ¶¶16, 17). Dwyer repeatedly threatened Maxson, slapping him, kicking the wind out of him and even pointed a handgun at Maxson. (Complaint at ¶ 18). Duffy, Pesavento and Defendant William Marley were nearby and did nothing to stop these actions. (Complaint at ¶ 22). Maxson ultimately gave a court reported confession to an Assistant States Attorney. (Complaint at pg. 2). Maxson insisted that he was only giving a statement "in order to clear myself" *Id.* Maxson was charged and convicted at trial – despite no physical evidence tying him to the crime. (Complaint at ¶ 36).

At trial, Serologist Therese Ann Finn testified that she examined blood found on a mirror and a shirt recovered from the scene and determined that it belonged to Murdock. (Complaint at ¶ 37). Finn further testified that the shirt also had bloodstains that were inconsistent with either Lindsey's or Maxson's blood – including blood on Murdock's hand that did not match either Murdock or Maxson. (Complaint at ¶ 38). Criminalist James Berk testified that he analyzed head and pubic hair samples taken from Murdock's clothing and found that they did not match the characteristics of either Maxson's or Murdock's hair. (Complaint at ¶ 39). Nevertheless, Maxson was convicted.

In the last couple of years, Maxson sought DNA testing on these items. The testing revealed that the DNA of a person named Osborne Wade was on Murdock's shirt. (Complaint at

¶ 40). Wade is a convicted murder – having pleaded guilty to stabbing another person two years after Murdock. *Id.* Wade also lived in close proximity to Murdock's murder scene. *Id.*

In light of the DNA discovery, on September 27, 2016, the Cook County State's Attorney's office moved to vacate Maxson's conviction and ordered Maxson released from the Illinois Department of Corrections. (Complaint at ¶ 41). After that, Wade was indicted for the murder of Murdock. (Complaint at ¶ 42). Wade has also given a videotaped confession to the police and FBI. *Id*

In his civil suit, Plaintiff alleges that a vast array of high ranking officers of the Chicago Police Department and the Cook County State's Attorney's Office conspired with Defendants to cause his wrongful charging, prosecution, conviction, and imprisonment by suppressing evidence of abuse and torture at Area 2 headquarters. (Complaint at ¶¶11-17, 51-93, 107).

## ARGUMENT

**I.      Count I Fails To Set Forth A Short Plain Statement That Gives Proper Notice To Defendants Of Plaintiff's Claims.**

Count I is captioned as a "42 U.S.C. § 1983 Claim for Deprivation of Fair Trial and for Wrongful Conviction." It re-alleges all of the other 145 paragraphs set forth in the complaint and is directed at all the Defendants. (Complaint at ¶110). "Indiscriminately incorporating every paragraph of every count in other counts, particularly the catch-all counts . . . can result, as it does here, in a complaint that does not tell some of the defendants why they are liable." *Andrews v. Burge,* 660 F.Supp.2d 868, 879-80 (2009). The core allegations in Count I are set forth in Paragraph 112, which states the following:

> 112. These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically coercing, constructing and/or fabricating the false and totally unreliable statements and admissions which formed the basis for Plaintiff's prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements and admissions were false, totally

3

> unreliable, constructed, fabricated and coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and other evidence, including, but not limited to, other acts of torture and abuse that they participated in, the instruments of torture, as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right not to be wrongfully convicted, as guaranteed by the U.S. Constitution.

*Id.*

Count I's smorgasbord of buzzwords fails to set forth a "short plain statement" that gives Defendants fair notice of the claims against them and fails to state a claim that is "plausible on its face." *Iqbal,* 556 U.S. at 678. No specific constitutional provision is identified in Count I. The only assistance provided by Plaintiff to put these Defendants (and this Court) on notice of the specific constitutional provisions they have violated, is his incorporation of paragraph 108 of the Complaint, which states the rights that were violated were "protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Complaint at, ¶108). Paragraph 112 appears to allege, *inter alia,* claims for physical coercion and excessive force, fabrication, malicious prosecution, *Brady* violations, testifying falsely, making "false public statements," and coercing Plaintiff's confession. Paragraph 113 adds a "failure to intervene" claim. Count I therefore violates Rule 10 and should be dismissed without prejudice to be pleaded properly.

### A. Plaintiff Has Not Alleged A Viable *Brady* Claim.

Plaintiff complains about two pieces of information that he alleges these Defendants failed to disclose: (1) the coercive tactics they utilized to extract a false confession from Plaintiff, and (2) information about a wider practice of Area 2 detectives using coercion to obtain false confessions in other cases. (¶112). In order to sustain a claim under *Brady v. Maryland*, 373 U.S.

83 (1963), a plaintiff must show: (1) evidence was suppressed by the government, either willfully or inadvertently; (2) the evidence at issue is favorable to the accused, either because it was exculpatory or impeaching; and (3) there is a reasonable probability that prejudice ensued. *Parish v. City of Chicago,* 594 F.3d 551, 554 (7th Cir. 2009).

1. **No *Brady* Violation For Plaintiff's Own Statement.**

The teachings of the Seventh Circuit mandate dismissal of any *Brady* claim based on the circumstances surrounding plaintiff's own statement to the police because he necessarily knew about them. That which is known, by definition, cannot be suppressed. *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), overruled in part on other grounds, *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006). In *Gauger*, the court held that a detective's allegedly false account of an arrestee's interrogation was not a *Brady* violation. The court stated, "[i]ndeed, the duty to disclose falls out, because Gauger knew what he had said at the interrogation." *Id.*; see *also Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) ("Harris' own alibi was not concealed from him and is therefore not properly a claim under *Brady*."); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) (there is no *Brady* obligation to inform accused that her own confession was coerced). The Seventh Circuit recently explained, "our case law makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015).

2. **No *Brady* Violation For Coerced Statements Obtained In Other Cases.**

Police investigators discharge their *Brady* obligation by disclosing exculpatory information to prosecutors that is not otherwise already known to them. *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015). However, the duty to disclose *Brady* material to the defense in a criminal case belongs to

5

the prosecutor. *Id.* at 512. Only the prosecutor knows what information has already been disclosed to the defense, whether disclosures are timely based on the status of court proceedings, and whether other information in his possession is material or would otherwise prejudice the defense if not disclosed. *Kyles v. Whitley*, 514 U.S. 419, 437-39 (1995).

### a. Prosecutors were aware of allegations of abuse in other cases.

Plaintiff alleges that widespread abuse of suspects at Area 2 is traceable to at least 1982, when Andrew Wilson was arrested and interrogated for the murder of two police officers. (Complaint at ¶¶64-5). According to Plaintiff, State's Attorney Daley allegedly learned of this widespread abuse from numerous sources and had personal knowledge of this abuse long before plaintiff was arrested. (Complaint at ¶68). For instance, Plaintiff has pleaded that on February 17, 1982, Superintendent Brzeczek received a letter from Dr. Raba, Director of Medical Services at the Cook County Jail, describing evidence that Andrew Wilson was physically abused and shortly thereafter forwarded it to State's Attorney Daley. (Complaint at ¶70). Plaintiff has also pleaded that State's Attorney Daley allegedly had direct knowledge of abuse in a substantial number of cases and shared this information with his high-ranking assistants, including his First Assistant and successor Richard Devine. (Complaint at ¶78,79). Plaintiff further pleads that State's Attorney Daley allegedly knew from reviewing information in possession of his office that Defendant Marley was claimed to be involved in some of these cases. (Complaint at ¶79). And, Plaintiff claims that the State's Attorney deliberately failed to disclose this information. *Id.*

These Defendants cannot be held accountable for a *Brady* violation caused by the decision of a prosecutor. The duty to disclose *Brady* is placed on "the prosecution, which alone can know what is undisclosed," and is "assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when" appropriate. *Kyles*, 514 U.S. 437.

Here, plaintiff has pleaded the State's Attorney had the knowledge plaintiff alleges police defendants withheld, thus, his *Brady* claim fails. *Id.*

### b. Plaintiff Admits That In 1990 The City of Chicago Publicized Allegations of Abuse At Area 2.

As shown above, no *Brady* violation occurs when the information complained about is alleged to have already been known to the defendant prior to plaintiff's trial. *Gauger v. Hendle*, 349 F.3d at 360. Information about the abuse allegations in the Andrew Wilson case was highly publicized and well known before Plaintiff was even arrested. Plaintiff concedes this point. The complaint alleges that in 1990 "the Office of Professional Standards ("OPS") for the Chicago Police Department issued two 'Special Project Conclusion Reports': the 'Goldston Report' and the 'Sanders Reports.' These reports detailed the excessive force Chicago police officers inflicted on Andrew Wilson in 1982 and the greater systematic abuse at Area Two during that time." (Complaint at ¶46).

According to the Complaint: "The Goldston report concluded: In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating but went into such esoteric areas as psychological techniques and planned torture. (emphasis added)." *Id.* And, on February 7, 1992, six months before Plaintiff was arrested, Judge Milton Shadur ordered the Goldston Report to be publicly released. (Complaint at ¶92).

Besides the Goldston report, allegations of abuse at Area 2 were published in newspaper articles in 1990 – one being a widely circulated article by John Conroy on January 25, 1990, titled House Of Screams *See* http://www.chicagoreader.com/chicago/house-of-screams/Content?oid=875107. Jon Burge was suspended in November of 1991. (Complaint at ¶58). As such, given the publicity alone, Plaintiff and/or his counsel through the exercise of

reasonable diligence could have discovered the vast majority of allegations of torture and misconduct from other cases, particularly because the alleged torture took place less than ten years before he was arrested and because articles and reports by OPS and the media were made public beginning in 1990. Evidence is suppressed, for purposes of *Brady*, only where "the prosecution failed to disclose the evidence before it was too late" for the defendant to make use of it and the evidence "was not otherwise available to the defendant through the exercise of reasonable diligence." *Harris,* 486 F.3d at 1015. *See Orange v. Burge*, 2008 WL 4425427 at 10 (N.D. Ill. Sept. 25, 2008) (plaintiff could have discovered evidence of Andrew Wilson's alleged torture through the exercise of reasonable diligence because this evidence was presented in "open court" on November 12, 1982 at the hearing on Wilson's motion to suppress). Likewise, the majority of other alleged victims filed motions to suppress and testified publicly not only at their own suppression hearings but also at hearings for other alleged victims, all of which Plaintiff could easily have learned of in the exercise of reasonable diligence[3].

In fact, the Illinois Appellate Court just last month rejected a *Brady* argument premised on the fact that the State failed to disclose allegations of misconduct against a police officer. *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 72. First, Gonzalez claimed that it was an "open and notorious secret" that Guevara (the police officer) framed suspects with "coerced and manipulated identification testimony." *Id*. As such, he could not claim that this was withheld, especially in light of other allegations that were alleged in other Appellate court cases. *Id.* Second, the Illinois Appellate Court explained: "even if the information regarding Guevara's

---

[3] *See e.g., People v Wilson*, 116 Ill.2d 29, 506 N.E.2d 571, 106 Ill.Dec. 771 (1987); *People v Mahaffey*, 128 Ill.2d 388, 539 N.E.2d 1172, 132 Ill.Dec. 366 (1989) (mentions Reginald Mahaffey's motion to suppress); *People v Mahaffey*, 165 Ill.2d 445, 651 N.E.2d 174, 209 Ill.Dec. 246 (1995) (mentions Jerry Mahaffey's motion to suppress); *People v Hinton*, 302 Ill.App.3d 614, 706 N.E.2d 1017, 236 Ill.Dec. 143 (1st Dist. 1998); *People v Bates*, 218 Ill.App.3d 288, 578 N.E.2d 240, 161 Ill.Dec. 113 (1st Dist. 1991); *People v Banks*, 192 Ill.App.3d 986, 549 N.E.2d 766, 140 Ill.Dec. 115 (1st Dist. 1989); *Cannon v Burge*, 2011 WL 4361529 (N.D. Ill. Sept. 19, 2011); *People v. King,* 109 Ill.2d 514, 488 N.E.2d 949, 94 Ill.Dec. 702 (1986).

misconduct in other cases would have been useful for impeachment at trial, and even if the State should have disclosed it, it is not of such conclusive character that it would have changed the result of Gonzalez's case. *See People v. Collins*, 2013 IL App (2d) 110915, ¶16–18, 368 Ill.Dec. 806, 985 N.E.2d 613 (police officer's suspension for knowingly providing inaccurate information in an unrelated case could not be used as impeachment where the claim that the officer had a motive to testify falsely was speculative, remote and uncertain.)

### B. Plaintiff Does Not Allege A Viable Federal Claim For False Testimony.

Embedded in the litany of wrongful acts allegedly committed by Defendants, Plaintiff states that they gave "false testimony." (Complaint at ¶112). Plaintiff fails to plead any facts that would put Defendant Marley on notice of any false testimony that he is accused of providing. However, Plaintiff claims that Defendant Duffy and Pesavento testified falsely when they denied abusing or threatening Plaintiff in any way during the hearing on Plaintiff's motion to suppress statements. (Complaint at ¶¶20-1). These Defendants have absolutely immunity from liability for any testimony that they provided in Plaintiff's criminal case. *Briscoe v. LaHue*, 460 U.S. 325, 330-31 (1983).

### II.     FEDERAL CLAIM FOR FAILURE TO INTERVENE IS INADEQUATE

There is no plausible basis for Plaintiff's failure to intervene claim. An officer can be liable under Section 1983 if he had reason to know that another officer was committing a constitutional violation and he had a realistic opportunity to intervene to prevent the harm from occurring. *Chavez v. Illinois State Police,* 251 F.2d 612, 652 7th Cir. 2001); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994). Plaintiff fails to identify the conduct that required intervention: whether Defendants had knowledge of the illegal conduct, or whether these Defendants had a realistic opportunity to prevent it. Instead, Plaintiff merely and vaguely alleges that "Defendants Dwyer, Duffy, Marley and Pesavento failed to intervene to stop Plaintiff's wrongful prosecution

and conviction and resultant imprisonment." (Complaint at ¶113). The protection of trial rights are normally the function of judges, prosecutors and defense attorneys. As shown above, the obligation to insure compliance with *Brady* is the duty of the prosecutor. *Kyles*, 514 U.S. at 437-39.

In *Andrews v. Burge*, 660 F.Supp.2d 868 (2009), the plaintiff sued State's Attorneys Daley and Devine for failing to investigate widespread allegations of abuse by Area 2 officers. Those allegations did not state a claim for failure to intervene because investigating criminal conduct is not a prosecutorial function. *Id* at 876. Likewise, while police have a duty to disclose evidence to prosecutors, disclosing *Brady* material to defense attorneys and performing other prosecutorial functions cannot be delegated to police officers. These Defendants cannot be liable for not performing, or for not "intervening" in, functions that they have no duty to perform. Plaintiff has not made clear what he means by his "failure to intervene" claim, and as pleaded it should be dismissed.

### III.  ANY FEDERAL CLAIMS FOR FALSE ARREST AND IMPRISONMENT ARE TIME BARRED.

Section 1983 does not have an independent statute of limitations; rather, it borrows the personal injury statute of limitations from the underlying state in which the court is located. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Accrual rules remain a matter of federal law. *Id*. In Illinois, the statute of limitations for a personal injury suit is two years. 735 ILCS 5/13-202. Plaintiff's false arrest and imprisonment claims are time barred under *Wallace v. Kato*, 549 U.S. 384, 397 (2007). Because "the statute of limitations upon a §1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process."

*Id.* Here, Plaintiff was detained pursuant to legal process no later than August 31, 1992, any Fourth Amendment claim is time barred.[4]

## IV. GENERALIZED ALLEGATIONS OF CONSPIRACY DO NOT STATE A CLAIM

Counts III and VII of Plaintiff's Complaint, which allege federal and state civil conspiracy claims, should be dismissed because plaintiff has failed to plausibly allege the existence of any conspiracy.

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir.1988). To establish conspiracy liability, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights. *Id.* at 442; *see also McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 103, 133 (1999)(To properly bring a conspiracy claim, plaintiff must allege that each defendant "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act in an unlawful manner."). A complaint cannot simply provide labels, conclusions, and a formulaic recitation of the elements of a claim; the complaint must allow the court to draw the reasonable inference that the defendant is liable. *Iqbal*, 556 U.S. at 678.

According to Plaintiff, during an unspecified period of time, "Defendants Dwyer, Duffy, Marley and Pesavento, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above." (Complaint at ¶120). The conspiracy allegedly includes everyone

---

[4] Any Fourth Amendment claim for "excessive force" that plaintiff may have had is likewise time-barred. *See, e.g., Washington v. Summerville,* 127 F.3d 552, 556-57 (7th Cir. 1997).

from the detectives who interviewed Plaintiff, to superintendents of police, to Mayor Daley. The claim is essentially a "catch-all" where each and every Defendant and unsued co-conspirator is alleged to have conspired regardless of whether they had any role in the investigation and prosecution of Plaintiff's case or even knew of Plaintiff's existence.

In *Andrews,* 660 F. Supp. 2d at 879-80, the court dismissed a similar conspiracy claim, stating as follows:

> Indiscriminately incorporating every paragraph of every count in other counts … can result, as it does here, in a complaint that does not tell some of the defendants why they are liable. The structure of this complaint is typical of the problems created by amorphous pleading. There are very specific allegations about what certain named police officers and a prosecutor did with respect to Andrews. The further up the chain of command the complaint goes, the more vague are the grounds for individual liability. It does not help to make equally general allegations that all defendants conspired with all other defendants and everything alleged against one is alleged against all. In a simpler case, a general conspiracy claim is adequate but not here.

Here, Plaintiff does nothing more than give the label "conspiracy" to counts containing vague, general allegations that Defendant Officers and all of the named unsued co-conspirators conspired with one another. In doing so, Plaintiff fails to inform Defendant Officers what it is they allegedly did that would justify a finding of liability against them.

Indeed, broad and sweeping allegations of torture and suppression aside, the crux of Plaintiff's complaint here is that Detective Duffy and Pesavanto physically coerced a confession from Plaintiff, lied about it at Plaintiff's suppression hearing and, because of that lie, the trial court refused to suppress the confession. Plaintiff seeks to base a constitutional claim on Duffy and Pesavanto's alleged perjury by claiming that Duffy and Pesavanto had a duty to disclose not only their personal misconduct but also the misconduct of other Area 2 police officers because that misconduct was highly exculpatory. Had Duffy and Pesavanto done so, according to Plaintiff, either his confession would have been suppressed or he would have been able to use the

alleged misconduct to get out of prison years earlier than he did. As explained above, however, Duffy and Pesavanto's perjury is not actionable,[5] they have no duty to disclose their own misconduct whether in Plaintiff's case or others[6] and they have no duty to Plaintiff to investigate and disclose the misconduct of other officers in other cases.[7]

Nonetheless, still scrambling to allege a constitutional claim where none exists, Plaintiff throws the names of several individuals into the mix and claims they were all tortured by someone at Area 2. He then names, but does not sue, another group of individuals (not one of whom is alleged to have any connection to Plaintiff's case or even know Plaintiff existed) and claims they either participated in or knew of the alleged torture of the other alleged victims. Finally, Plaintiff then claims that this other alleged torture constituted a pattern and practice of torture at Area 2 and that the unsued individuals conspired with Defendant Officers to suppress this pattern and practice of torture at Area 2 from Plaintiff.

The alleged actions or inactions of the unsued co-conspirators, however, do not constitute "suppression." With respect to Burge and Byrne, Plaintiff appears to be alleging that they either committed perjury or were silent about their alleged misconduct *in other cases*. However, even if Burge and Byrne had been involved in Plaintiff's case, their alleged perjury (like Duffy's and Pesavanto's) would not have been actionable and, under *Brady* (and consistent with their own constitutional rights under the Fifth Amendment), they would have had no duty to disclose their alleged misconduct. *Supra* at n 8-10. But Byrne and Burge are not alleged to have had anything

---

[5] *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1029 (7th Cir. 2006)

[6] *Saunders-El v. Rhode*, 778 F.3d 556, 562 (7th Cir. 2015)

[7] *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (N.D. Ill. 1993); *Bandari v. City of Chicago*, 2000 WL 89135, at *6 (N.D. Ill. 2000)

to do with Plaintiff or his case[8], and following his reasoning to its logical conclusion, Plaintiff is asking the Court to create a *Brady* obligation that requires every police officer to contact every criminal defendant and disclose any misconduct he or she has ever engaged in *or been accused of* just in case such disclosure might help that Defendant's case. The appalling nature of the allegations of torture at Area 2 cannot and should not be used to create constitutional rights that simply do not exist or to implausibly expand rights that do exist.

As for the remaining unsued co-conspirators, Plaintiff appears to be alleging that it took them too long to investigate allegations of torture and that once they did, it took them too long to disclose the results of the investigation and made false public statements about the results. Again, neither a failure to investigate nor a failure to disclose the results of an internal police investigation nor any public statement discrediting the results of that investigation constitutes "suppression" under *Brady*. In short, with no actual suppression by Defendant Officers or any of the co-conspirators, there can be no conspiracy to suppress.

Not only are the actions allegedly taken by the conspirators not acts of suppression under *Brady*, Plaintiff fails to allege any agreement between the conspirators (or any facts from which an agreement could be inferred) to deprive Plaintiff of *his* constitutional rights. He does not allege that any of the unsued co-conspirators knew he was arrested or charged; he does not allege that they were present at Area 2 during his interrogation; he does not allege that they knew anything about him or his case or his experience at Area 2. With no agreement to deprive *Plaintiff* of *his* constitutional rights, Plaintiff has no claim for conspiracy.

---

[8] Burge was suspended from the Chicago Police Department in 1991 and fired by 1993. https://en.wikipedia.org/wiki/Jon_Burge. Burge had stopped working for CPD before Maxson was even arrested.

## V. STATE LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS TIME BARRED

Plaintiff's intentional infliction of emotional distress ("IIED") claim is subject to a one-year statute of limitations. *See* 745 ILCS 10/8–1; *Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006) ("The limitations period for tort claims, such as intentional infliction of emotional distress, against governmental entities and their employees [ ] is only one year"). The Seventh Circuit recently rejected the continuing tort doctrine in the context of IIED claims in *Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013). In language directly applicable to Plaintiff's claim here, *Bridewell* was summarized as follows: "the plaintiff in *Bridewell* argued that her claim accrued every day the defendant detectives did not tell the prosecutors to dismiss the criminal indictment because their statements were unreliable." *Gibbs v. Vill. of Flossmoor*, 2014 WL 1396184, *6 (N.D. Ill. 2014), *citing Bridewell*, 730 F.3d at 678. "In rejecting this argument, the Seventh Circuit reasoned '[t]he idea that failing to reverse the ongoing effects of a tort restarts the period of limitations has no support in Illinois law—or in federal law either.'" *Id., quoting Bridewell*, 730 F.3d at 678. Plaintiff does not allege any wrongful conduct within one year of filing his complaint. Therefore, the IIED claim should be dismissed.

## CONCLUSION

The claims asserted in the Count I, III, VI, and VII of the Complaint should be dismissed with prejudice because they fail to state a claim upon which relief may be granted.

Respectfully submitted,

/s/ Avi T. Kamionski  
One of the Attorneys for Defendants John Duffy, Angelo Pesavento, and William Marley

/s/ Amy P. Engerman  
One of the Attorneys for Defendant City of Chicago

**CERTIFICATE OF SERVICE**

  I, Avi T. Kamionski, an attorney, hereby certify that on January 19, 2017, I electronically filed the attached Motion with the Court's CM/ECF system, which simultaneously sent an electronic copy of the same to all counsel of record.

                /s/ *Avi T. Kamionski*

Andrew M. Hale
Avi T. Kamionski
Shneur Z. Nathan
HALE LAW LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL 60604
312-341-9646

James Sotos
Amy Engerman
Jeffrey Given
Sara Schroeder
THE SOTOS LAW FIRM
550 E. Devon Ave., Suite 150
Itasca, IL 60143
630-735-3300