## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK MAXSON, | ) | |
| Plaintiff, | ) | No. 16 C 9417 |
| vs. | ) | |
| | ) | Honorable Robert W. Gettleman |
| JOHN DUFFY, WILLIAM MARLEY, | ) | |
| ANGELO PESAVENTO, | ) | Hon. Mag. Judge Jeannice Appenteng |
| and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, MARK MAXSON, by and through his attorneys,

ELLIOT R. ZINGER, Esq., and LARRY M. DREYFUS, Esq., and presents his FIRST

AMENDED COMPLAINT pursuant to 42 U.S.C. § 1983, and in support thereof, states as

follows:

### INTRODUCTION

Mark Maxson spent 24 years in prison because of the egregious and criminal conduct of

Chicago Police officers who worked under the supervision, direction and command of Jon Burge

at Area 2 Headquarters in Chicago. Mark Maxson is one of hundreds of African American men

in Chicago who were tortured into giving false confessions by Burge era officers. The pattern

and practice of torture was so widespread and pervasive that it is has been, in the words of

Federal District Court Judge Milton Shadur, "common knowledge" (for now decades). *See infra*,

*United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999). Stories of

exoneration of such torture victims have appeared in the media so frequently that many of us

have become desensitized to their impact upon us as a civilized society as well as to their

historical significance. Even amidst all of these highly publicized exoneration cases, Mark Maxson's case is both unique and quite simply, astonishing.

In 1994, Mark Maxson was convicted of the brutal stabbing murder and sexual assault of 6 year old Lindsey Murdock. Mr. Maxson's conviction was based upon his false confession. It was extracted at Area 2 headquarters by Burge era detectives. What makes Maxson's case unique is that in 2016 a DNA test established that the real murderer was not Maxson, but instead Osborne Wade. Mr. Wade lived a few homes from where the 6 year old's body was found. During a 2016 police interview, Mr. Wade confessed that he murdered Lindsey Murdock. Wade later pled guilty and was sentenced to 50 years in prison. During his sentencing hearing, he stipulated that he stabbed the child.

Mr. Maxson's nightmare started when he originally came forward to the police and to the news media in order to assist in the investigation of Lindsey's shockingly violent murder. Maxson had seen the child the night before, bought him a bag of chips and told him to go home. Mr. Maxson accompanied the detectives to Area 2 to provide them information, but that night found himself in a locked interview room. While in the police station for the next *60 hour*s, allegedly "assisting the police",  Maxson voluntarily gave blood and hair samples at the request of the detectives. Maxson was shown false crime lab report by the Detectives Duffy and Dwyer which indicated the his blood, hair and fingerprints were found on the murder scene. Such reports were composed in order to apply pressure to an already highly stressed and sleep deprived Maxson in hopes to break him. The false reports were destroyed by the detectives in order to conceal what they had done. Prior to showing such false evidence to Maxson, Detectives Dwyer and Duffy conspired with Detective Robert Tovar to inform Maxson that he failed a lie

detector test which questioned whether Maxson was inside the abandoned garage. The test had no scientific validity whatsoever and was performed (assuming it ever was performed) for the purpose of stressing and confusing Maxson hoping he would give a false confession. After the test was "performed" the charts which would have shown the actual results of the test were destroyed.

At Maxson's trial, the State's scientific witnesses testified that the blood and pubic hair samples recovered from the victim *did not match Mark Maxson.* Since these test results were known well before trial, the police and prosecutors should have concluded that an unidentified third party was the murderer, and not Maxson. That, of course, did not deter them from prosecuting Maxson. They simply relied upon the oral statement elicited after 60 hours from a *highly stressed* and *desperate to leave the station* Mr. Maxson.

As stated, after being detained at Area 2, Maxson gave an oral statement in front of a Court Reporter. What happened during the 60 hours before the court reported statement was given we will never know because the Detectives destroyed all of their interview notes with Maxson. The Detectives did this purposefully in order to sanitize the record during the entire period that Maxson was detained. Doing this allowed the Detectives to hide from the jury Maxson's repeated claims of innocence as well his requests to contact his family members and an attorney. It also allowed the Detectives to create a false narrative of what actually occurred during the detention. The court reported statement, when it was orally given, provided vivid details of this horrible crime. Most of such details were picked up and or amplified by Maxson during his lengthy detention period. When the Assistant States' Attorney reviewed the Court Reported statement with Maxson, Maxson insisted that contain the the language that he gave

each sample "*in order to clear myself.*" Maxson refused to sign the court reported statement or even to initial the agreed upon corrections. No one asked Maxson why. They obviously didn't want to hear and document Maxson's response.

Amidst rampant publicity and community pressure, the police needed to solve this crime in order to pretend that they were doing their job and to assure the public that they were now safe. And like in so many other notorious cases, better to swiftly solve a murder by taking a false confession from an innocent man than to leave a case open and perhaps forever unsolved. In this case, *a child rapist and killer was left to wander the Chicago streets* in the Roseland community while Mark Maxson languished in custody. Some two years later, the actual murderer, Osborne Wade, struck again, brutally stabbing to death another victim in the same community. Wade's DNA was recovered from both the pants and the shirt worn by the victim in the abandoned garage where the murder occurred. After his arrest for the murder, Wade wrote letters of apology to the victim's family and to Mark Maxson, begging for their forgiveness.

The Conviction Integrity Unit of the Office of the Cook County State's Attorney, the same office that prosecuted Maxson, investigated Maxson's claim of innocence. At the conclusion of their investigation, it filed a motion to vacate Maxson's murder conviction. In 2016, Judge Thaddeus Wilson granted the motion and vacated the conviction. Later in 2016, the Judge Steven Watkins entered a Order granting Maxson a Certificate Of Innocence for the murder of Lindsey Murdock. The State did not object to the granting of the Certificate of Innocence. Several years later, Wade pled guilty and was sentence to 50 years in the Department of Corrections pursuant to a plea agreement to the reduced charge of Attempt Murder. During the sentencing hearing, Wade stipulated to the fact that he stabbed the young victim.

For decades, police, prosecutors and public officials were fully aware of the Chicago Police Department's pattern and practice of violence and injustice towards the African-American community. They did nothing to stop it. To the contrary, in the face of all of the evidence, many denied, and to this day still deny, that it ever occurred. Mark Maxson, through this lawsuit, seeks compensatory and punitive damages for the grievous injuries inflicted upon him from the persons and public entities responsible for this horrible miscarriage of justice.

## I. JURISDICTION AND VENUE

1. This is a civil rights action brought pursuant to: 42 U.S.C. § 1983 et seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein.

## II. PLAINTIFF, NAMED DEFENDANTS AND UNSUED CO-CONSPIRATORS

3. Plaintiff Mark Maxson is an African-American man, and a citizen of the United States.

4. Defendant JOHN DUFFY was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

5. Defendant WILLIAM MARLEY was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

6. Defendant ANGELO PESAVENTO was, at all times relevant to this complaint, a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

7. Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the Chicago Police Department, its Office of Professional Standards, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his office, and his City Council, the Corporation Counsel's Office, and the Chicago Police Board. The City of Chicago is and/or was the employer of each of the Defendant Officers, and Detective Dwyer and Sgt. Lawrence Augustine. The City of Chicago is responsible for the acts of the Defendant Officers, Detective Dwyer and Sgt. Lawrence Augustine, while employed by the City of Chicago and while acting within the scope of their employment.

8. UNSUED DETECTIVE JAMES DWYER was deceased at the time of the filing of the original Complaint. JAMES DWYER was a co-conspirator with JOHN DUFFY, ANGELO PESAVENTO and WILLIAM MARLEY in the acts alleged herein. Specifically, At all times

relevant to this complaint, JAMES DWYER was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit, who engaged in, and failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment.

9.  UNSUED SGT. LAWERENCE AUGUSTINE was the named detectives' supervisor. At all times relevant to this complaint, LAWERENCE AUGUSTINE was a duly appointed and sworn Chicago Police Officer who was assigned to Area 2 Violent Crimes Unit, who intentionally or unwittingly engaged in, and/or failed to stop, a pattern and practice of torture and brutality, and who engaged in the conduct complained of in the course and scope of his employment.

10. UNSUED DETECTIVE ROBERT TOVAR, at all times relevant to this complaint, was a duly appointed and sworn detective of the Chicago Police Department, who conducted polygraph examinations, and who engaged in, and/or failed to stop a pattern and practice of conduct, described below, all done within the course and scope of his employment.

11. At all times relevant to this complaint, each of the named Defendants along with unsued co-conspirators JAMES DWYER, ROBERT TOVAR and LAWERENCE AUGUSTINE acted in the scope of their employment, and under the color of the laws, regulations, and customs of the State of Illinois. Their actions constituted "state action" as defined under federal law.

### III. STATEMENT OF FACTS

**A.  IN 1992, PLAINTIFF WAS DETAINED, ARRESTED AND FORCED TO CONFESS TO A HORRIBLE SEXUAL ASSAULT AND MURDER THAT HE DID NOT COMMIT. BASED SOLELY UPON HIS FALSE CONFESSION, PLAINTIFF  WAS WRONGFULLY CONVICTED AND HAS SPENT THE PAST NEAR QUARTER OF A CENTURY INCARCERATED.**

12. On August 31, 1992, Plaintiff was unlawfully seized by detectives of the Chicago Police Department and detained under color of law and without due process for a period of three days (approximately 60 hours) at the Area 2 Chicago police station at 111th & Ellis in Chicago, Illinois.

13. It was Plaintiff who first contacted the police and attempted to assist in the murder investigation of the six (6) year old child/victim Lindsey Murdock. Plaintiff provided information to a local TV news station covering the story that he had seen the victim the night before in the neighborhood.

14. On August 30, 1992, Plaintiff went to the crime scene of the murder, with the intent to assist the police by advising them he had seen the victim the night before. When he arrived at the crime scene, Plaintiff was interviewed by a local TV station. During his interview, the detectives at the crime scene became aware of Plaintiff.

15. Defendant Detectives Angelo Pesavento and William Marley requested the Plaintiff to accompany them to Area 2 to be interviewed. The detectives assured him "it wouldn't take long." "They had no leads or suspects at that time.

16. Once at Area 2, the detectives unlawfully detained Plaintiff for 3 days, approximately 60 hours. The detectives involved in Plaintiff's unlawful seizure, detention and ultimately, his false and coerced confession, were: William Marley; Angelo Pesavento; James Dwyer and John Duffy.

17. Once at the station, Defendants Pesavento and Marley interrogated Plaintiff numerous times and kept him in a locked interview room.

18. The detectives made no notes or General Progress Reports (GPRs) of any of the interrogations with Maxson (or any other interrogations with Maxson during his 60 hour, detention) which were required to be made part of the investigative file, if they ever existed. The detectives's failure to take notes and to make GPRs, as well as the requirement to place said notes and GPRs into the investigative file was contrary to Chapter 18 of the Chicago Police Department's regulations.

19. Defendants John Duffy, Angelo Pesavento and William Marley, along with Unsued Detective James Dwyer were all directly involved in the detention and multiple interrogations of the Plaintiff during his 60 hour detention. Detective Duffy and his partner Dwyer interviewed Plaintiff approximately 4-5 times. No notes or General Progress Reports of Detectives Dwyer's and/or Duffy's interrogations with Maxson were ever made part of the investigative file. Regardless that Detective Duffy believed that notes and GPRs were required to be put in the investigative file by a Court Order, this was never done. To this day, no notes or GPRs of any of the Detectives' interviews with Maxson have been produced, likely because they were destroyed .

20. Defendant John Duffy threatened Plaintiff in the police station as follows… "Mother-fucker, if you don't cooperate with us, we're going to kick your ass." Detective Pesavento interrogated Plaintiff shortly after these threats were made by Detective Duffy. No notes or General Progress Reports of Detective Pesavento's conversation with Maxson were ever produced by the Defendants.

21. Detective Duffy and his partner Dwyer denied Plaintiff's requests for an attorney and proceeded with their coercive interrogation. Plaintiff's requests for an attorney were

suppressed by Duffy and Dwyer as they purposefully failed to document and preserve such requests.

22. Detective James Dwyer was especially instrumental in coercing Plaintiff's confession by his repeated threats of violence, racial slurs, slapping, kicking the wind out of ~~him~~ Plaintiff, and ultimately, by elevating his ankle holster which contained his handgun in Plaintiff's direction.

23. Upon information and belief, Detectives John Duffy, Angelo Pesavento and William Marley were in close proximity to the Plaintiff during his interrogation process and they knew, or should have known, of the above stated physical abuse endured by Plaintiff. As their supervisor, Lawerence Augustine had a duty to know the whereabouts and actions of the detectives he supervised. He also had the responsibility of maintaining the integrity of the investigative file, which he completely failed to do. Supervisor Augustine and Defendants Duffy, Pesavento and Marley did nothing to stop such physical and emotional abuse.

24. Defendant Duffy gave false testimony at Plaintiff's Motion to Suppress Statements, when he testified that Plaintiff was never threatened by a fellow detective with a physical beating. Further, Defendant Duffy testified falsely at said Motion that Plaintiff was never kicked, slapped or threatened with a handgun by a fellow detective.

25. Defendant Pesavento falsely testified at said Motion that Plaintiff was never threatened or struck by a fellow detective before implicating himself in the murder. Detective Dwyer similarly testified falsely that Plaintiff was never threatened verbally, struck or threatened with a handgun by himself or a fellow detective. Further, Dwyer falsely testified that Maxson never requested to leave the police station. Plaintiff's requests to go home were suppressed by the Detectives as they purposefully failed to document all such requests.

26. Detectives Dwyer, Duffy, Pesavento and Marley never informed the responding Assistant State's Attorneys of the Felony Review Unit of the abuse that was inflicted upon Plaintiff at Area 2.

27. Since the time of trial, newly discovered evidence has arisen that Area 2 detectives, under the supervision of Jon Burge, have documented histories of abusing arrestees in their custody, and/or knowing of such abuses but remaining silent of the abuses, and/or having taken the 5th Amendment when called upon to testify concerning these abuses.

28. This newly discovered evidence documents a pattern and practice by Area 2 Chicago Police detectives, including the Detectives involved in this case, of abusing arrestees, during the Jon Burge reign of terror on the Southside of Chicago. This newly discovered evidence also documents a failure of the Chicago Police Department to supervise its officers to prevent such abuses.

29. These detectives, along with the prosecutors assisting them when deciding whether to arrest Plaintiff, were fully aware that Plaintiff added to his confession that he voluntarily provided hair and blood samples in order, *in his own added words*… "to clear myself." At the end of the police investigation, the Detectives, their supervisor and the prosecutors were aware that Maxson added to his confession that he had provided blood and hair samples "to clear myself". Later, the Chicago Crime Laboratory notified both the Detectives and prosecutors that Maxson's blood and hair samples did not match those found at the crime scene and on the victim. Yet, the decision was made to try Maxson anyway.

30. Consequently at trial, neither the Detectives nor the prosecutors were surprised when the State's forensic experts testified that the Plaintiff's blood and hair samples *did not match* any blood or hairs found on or about the victim.

31.  The Defendant Detectives, along with Detective James Dwyer, supervisor Augustine and prosecutors were fully aware that there was no physical evidence and/or eyewitness testimony against the Plaintiff. The only evidence used to convict Maxson was his false oral statement that was recorded by a court reporter.

32. Being aware of the lack of evidence, Defendant Detectives, along with Detectives James Dwyer and Sgt. Lawerence Augustine, knowingly concealed, withheld, and/or destroyed exculpatory and impeachment evidence from prosecutors and defense attorneys in an effort to engineer Maxson's wrongful conviction.

33. For example, the Defendant Detectives, along with Detective James Dwyer, took notes during their multiple interviews of Maxson at Area 2. During those interviews, Maxson repeatedly denied committing the murder. These denials and other statements Maxson made were exculpatory. The detectives destroyed or concealed all of the notes that they took during Maxson's 60 hours of detention. These notes were required by Police Regulations' Chapter 18 to be preserved for the purpose of aiding the defense.

34. The destruction or concealment of all such notes deprived Maxson of a fair trial because he was unable to prove to the judge and jury that he repeatedly denied being involved in the murder for over 50 hours prior to giving his false court reported statement.

35. The destruction of all such notes by the Detectives was done knowingly and purposefully in order to give the trier of fact the impression that Plaintiff was at the station voluntarily and

continuously for 60 hours in a locked interview room, without a single complaint or care in the world.

36. Further, the destruction or concealment of all such notes sanitized the record and opened the door for the Detectives to commit perjury at will and without repercussion as to what had transpired during the 60 hour detention of Plaintiff.

37. Further, by destroying or concealing these notes the Defendant Detectives, along with Detective James Dwyer and with the approval or tacit approval of Supervisor Augustine, prevented the notes from being included in Chicago Police Department's investigative file, in violation of Chapter 18 (see- paragraph 44, 3C4 below). Thus, CPD's investigative file had no contemporaneous record of what transpired during Maxson's 60 hours of interrogations.

38. During Maxson's 60 hours of detention, Detectives Duffy and Dwyer, conspiring with one another, showed Maxson signed documents purporting to be laboratory results from the Chicago Crime Laboratory. Further, these detectives knowingly and intentionally falsely advised Maxson these laboratory reports proved that Maxson's hair, blood and fingerprints were at the crime scene. During the discovery process, the Defendants were asked to produce these Chicago Crime Laboratory reports and have not.

39. Creating these false crime lab reports and showing them to Maxson was purposefully and maliciously designed to intimidate Maxson and break his will, and ultimately to cause his false confession. On information and belief, this false evidence was destroyed or concealed by Detectives in their attempt to cover up their conspiracy to violate Plaintiff's due process rights and to frame Maxson, an innocent man.

40. The detectives' fraudulent use of the above described Chicago Crime Laboratory reports, 60 hour detention, untrustworthy polygraph results, isolation, lack of sleep and physical and

psychological coercion did in fact ultimately lead to the breaking of Maxson's will, which eventually led him to falsely confess to the murder of Lindsey Murdock.

41.  Because of this destruction or concealment of evidence, including the false Chicago Crime Laboratory reports, polygraph examination's chart and the interview notes, the trier of fact was wholly unable to assess the circumstances of Maxson's state of mind prior to the detectives breaking his will with their coercive techniques.

42.  The Detectives' conspiracy was designed to hide the truth; that Plaintiff was repeatedly and desperately pleading his innocence, requesting to go home, requesting to see his family and requesting to speak to an attorney.

43.  The Detectives' destruction of evidence not only violated Maxson's Due Process rights, but also was in direct violation of police regulations in effect in 1992, as set forth in Chapter 18 of Chicago Police Department's regulations. Their conduct also violated accepted national standards for police Detectives violated multiple sections of Chapter 18, "Investigative Files", the controlling policies in effect in the Chicago Police Department in August/ September of 1992, including:

> 1.A.3 Which states that it is the policy of the Chicago Police Department to "***record and preserve information*** obtained by any Department member during an investigation."
>
> 1.C.1 Which states that "All ***notes, memoranda, and other documents*** will be placed into an investigative file case folder in all . . . homicide cases."
>
> 1.A.2 Which states that it is the policy of the Chicago Police Department to "***maintain the integrity of its investigative files so that the due process rights*** of the accused are not compromised during an investigation or subsequent prosecution."
>
> 2E. Which states that "A General Progress Report is a Department form used by Division members. It ***standardizes the recording of handwritten notes*** and memoranda, including written inter-watch communications, ***witness or suspect interview notes***, on scene canvass notes, and any other personal notes normally generated by Division members during an investigation."

3B3. Which requires supervisors to ensure that: " . . . all submitted documents are reviewed, inserted into the investigative file case folder, and logged on the Investigative File Inventory sheet when an investigative file case folder exists."

3C1. Which states that Detectives "*will . . . record and preserve all relevant information* during their investigations" and

3C2. Which states that Detectives "*will . . . transcribe relevant information which initially had been recorded upon General Progress Reports*, major incident worksheets, and other miscellaneous investigative documents onto a case report or a Supplementary Report following the proper format."

3C4. Which states that "**Detectives** *will . . .*

.*submit all hand written notes and investigative documents* generated or received to the unit supervisor for review and *inclusion in the investigative file case folder.*"

44. The Detectives intentionally and maliciously violated Maxson's Due Process rights and violated the written policies of the Chicago Police Department by not preserving notes, by destroying notes, by not creating GPR's and/or by destroying GPR's, by not transcribing relevant information which initially had been recorded in General Progress Reports into their Case Reports and/or Supplementary Reports and by failing to forward all relevant information to their unit supervisor for inclusion in the investigative file case folder.

45. The Unit Supervisor, Sergeant Augustine, provided his approval or tacit approval by not asking questions of the detectives, thus leaving them wholly unaccountable.

46. Additionally, these Detectives caused this exculpatory evidence to be withheld from Cook County Prosecutors, who have a duty to seek the truth.

47. The Detectives misconduct directly and proximately resulted in the unjust criminal conviction of Maxson, thereby denying his constitutional right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments.

48. In the case of *Bolden v. Pesavento*, a Civil Rights action, the jury awarded Plaintiff Eddie Bolden $24 million dollars and assessed punitive damages against the very same Defendant,

Page 15 of 53

Angelo Pesavento, in the amount of $100,000. One of the allegations in that matter was that the Defendant Officers, which included Pesavento, *destroyed multiple pieces of evidence, including interview notes*. This led to Bolden's wrongful conviction and subsequent 22 years of imprisonment.

49. Maxson was subjected to a Lie Detector test on the second day of his detention. The test was administered by Unsued Detective Robert Tovar of the CPD. Tovar used the test as an interrogation tool to cause Maxson to have emotional distress by accusing him of being deceptive, with the ultimate purpose of causing him to confess to a murder he did not do.

50. Unsued Detective Tovar knew the polygraph test's questions he administered to Maxson were not scientifically based; Tovar conspired with Detectives Duffy and Dwyer to break down Maxson's resistance to confessing, instead of using the test to seek confirmation of Maxson's credibility.

51. On information and belief: (1) Unsued Detective Tovar told Maxson the polygraph test showed him to be deceptive as to whether he had been in the abandoned garage; and (2) this test result was fabricated by Tovar.

52. Regardless that the polygraph machine's chart was specifically requested during discovery, it was never produced. Upon information and belief, Unsued Detective Tovar and/or the Detectives either destroyed or concealed the chart to prevent it from being included in Maxson's investigative file, in direct violation of their duty to preserve all relevant information pursuant to Chapter 18, 3c1.

53. After the test was completed, the physical evidence showing the results of the test (polygraph "chart") were never produced, leaving 3 possible explanations: 1) they were

*destroyed* or *concealed*; 2) they were *lost*, or 3) the entire polygraph procedure was a sham and *no test was ever administered*.

54. In the Federal case of *Corey Batchelor v. City of Chicago*, et. al, 18 CV 8513, Detective Tovar was sued for administering a polygraph to Bachelor and fabricating the results. Batchelor's polygraph charts were preserved in that case and ***clearly show*** that Tovar fabricated the results of the test to Batchelor and lied to Batchelor in order to induce a false confession. The matter was settled favorably for Batchelor.

55. The administration of Maxson's "polygraph test" was a factor in breaking down Maxson's will which eventually led him to falsely confess to the murder of Lindsey Murdock.

56. Finally, Detectives Duffy and Dwyer, in an effort to break down Maxson's will, conspired to engage in the familiar good cop/bad cop routine designed to elicit a false confession.

57. Further, Defendant Marley, in another effort to soften up Maxson, served Maxson bourbon while he was detained at Area 2. Upon information and belief, Marley's conduct described in this paragraph was not an isolated incident.

58. Absent the misconduct described herein, the prosecution of Maxson could not have and would not have been pursued, and Maxson would not have been convicted. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of Maxson, and in total disregard of the truth and Mr. Maxson's innocence.

59. The malicious intent of the Detectives was exemplified by the false Supplementary Police Report, dated September 3, 1992. That report falsely claimed that Detective Pesavento drew a plat of the inside of the abandoned garage and that Maxson made X marks on the plat on the place where he buried the body and had sex with the young victim.

60. This false story of the plat was detailed in Detective Pesavento and Marley's the September 3, 1992 official Supplementary Police Report. Yet, the plat has never been produced to anyone, including the ASA's who arrived at Area 2 within hours of the time the plat was allegedly drawn, at a time where there was no court reported statement.

61. Similarly, the plat was never produced to the prosecutors who tried the Maxson murder case, despite the fact that the court reported statement was not signed or initialed and indicated 3 times that Maxson was trying to "clear himself."

62. The plat story is obviously completely false, yet, it is clear and indisputable evidence that the Detectives intended to frame Maxson for the murder *by any means necessary.*

63. As a result of all of the misconduct described herein, Maxson suffered through 24 years of wrongful incarceration.

64. All of the detectives continue to commit perjury to this day regarding their conduct, including their destroying and fabricating evidence, in a continuing effort to cover up their conspiracy to frame Maxson.

65. The only evidence against the Plaintiff was his unsigned "oral confession" in which he stated three times that he was trying to *clear himself.*

66. Given the detectives involved in Plaintiff's interrogation now well documented history of torturing other suspects during the Jon Burge era, the credibility of Plaintiff's "confession" is severely undermined.

67. Further, the believability of said confession is also severely undermined by Wade's conviction described above as well as the coercive circumstances of Plaintiff's detention.

68. Plaintiff has consistently maintained throughout his litigation process that the only reason he gave false inculpatory information at was because he was stressed, threatened, assaulted and beaten by the detectives.

69. Prior to his trial, Plaintiff testified at his Motion to Suppress Statements that he voluntarily accompanied the detectives to the Area 2 police station but did not wish to remain there for three (3) days locked up in a room with only a steel bench.

70. Defendant Pesavento testified falsely at said Motion to Suppress Statements that Plaintiff willingly spent the first night in the interview room, although the room was not equipped with a bed or a cot. Maxson testified that he was locked in the interview room.

71. Plaintiff did not sleep at all the first night of his detention.

72. During Plaintiff's 60 hour detention, Plaintiff was left in a room with lights on all night, needed a police escort to go to the bathroom, had little food or water, was completely isolated, was repeatedly told that he was guilty, was told that he had failed the polygraph, was told that his blood, hair and fingerprints were found on the scene, was called a "nigger", was beaten and threatened and was told that he should confess because the strong evidence would convict him anyway.

73. Plaintiff testified at his Motion to Suppress Statements that he was beaten and threatened in the manner described in this Complaint. Since the Motion to Suppress, Plaintiff has consistently maintained that he was beaten and threatened.

74. The Motion to Suppress was denied, largely because the Court was unaware of the pattern and practice of torture at Area 2 headquarters due to a conspiracy between police, prosecutors and public officials to conceal such torture practices in order to obtain criminal convictions.

**B. EXPERT FORENSIC TESTIMONY OFFERED BY THE STATE AT PLAINTIFF'S CRIMINAL TRIAL ACTUALLY EXCLUDED MAXSON AS THE PERPETRATOR AND POINTED TO AN UNIDENTIFIED THIRD PARTY. NOW, AFTER RECENT DNA TESING HAS BEEN CONDUCTED, THE IDENTITY OF SUCH THIRD PARTY HAS BEEN ESTABLISHED.**

75. As indicated, **e**xcept for Maxson' coerced confession, the State failed to produce any evidence that Maxson participated in, or was in any way associated with, the horrible murder of child/victim Lindsey Murdock.

76. At trial, State Witness and Serologist Therese Ann Finn testified that she examined blood found on a mirror recovered from the scene and determined that it belonged to child/victim Lindsey Murdock.

77. At trial, Finn testified that the shirt and pants found in the abandoned garage had bloodstains that ***did not match the characteristics*** ***Lindsey's or Maxson's blood***.

78. At trial, State Witness and Criminalist James Berk testified that he analyzed head and pubic hair samples taken from Lindsey's clothing and found that they also ***did not match the characteristics of either*** ***Maxson's or Lindsey's hair***.

79. Now, some 25 years later, recent DNA testing has revealed that DNA belonging to one Osborne Wade was found to be mixed with child/victim Lindsey Murdock's blood. This recently identified individual is a convicted murderer, having pled guilty to stabbing another individual to death *approximately two years after Lindsey Murdock's murder*.

80. Further, investigation has revealed that at the time of Murdock's stabbing murder, Wade *lived in very close proximity the murder scene*, i.e., the garage where young Lindsey's body was recovered under a pile of debris.

81. On September 27, 2016, upon motion by the Cook County State's Attorney Anita Alvarez, through her Conviction Integrity Unit, an Order was entered by the Honorable Judge Thaddeus L. Wilson vacating the judgment of conviction against Maxson and ordering his immediate release from the Illinois Department of Corrections.

82. Wade gave a videotaped confession to the police regarding his commission of this horrible crime. On or about September 27, 2016, Wade was indicted by the Cook County Grand Jury for the murder of Lindsey Murdock and later pled guilty.

**C. MAXSON'S CONSISTENT CLAIMS SINCE THE TIME OF HIS ARREST THAT HIS CONFESSION WAS FALSE AND COERCED ARE SUBSTANTIATED BY NEWLY DISCOVERED EVIDENCE THAT AREA 2 DETECTIVES WERE ENGAGED IN A PATTERN AND PRACTICE OF TORTURE SO AS TO EXTRACT FALSE CONFESSIONS IN MURDER CASES.**

83. The detectives and their supervisors involved in Maxson's case have long histories of physically and psychologically abusing suspects by either direct participation and/or silent acceptance of what they knew or should have known what was occurring at Area 2. Until recently, however, allegations of such torture were routinely ignored.

84. Newly discovered evidence gives new meaning to Maxson' claims and shows a pattern of abuse that makes the truth of his allegations indisputable.

85. This is especially so given the lack of any other evidence in Maxson's case; his refusal to sign the "confession"; his attempting to "clear himself" of a horrible murder while supposedly confessing. These facts are bolstered by the recent identification of the actual killer.

86. While the revelation of the Chicago police torture began in the early 1990s, it is only within the last few years that the extent of the torture and the identities of many of the offending

officers have been fully explored. This process began in 1990, when the Office of Professional Standards ("OPS") for the Chicago Police Department issued two "Special Project Conclusion Reports," the "Goldston Report" and the "Sanders Reports". These reports detailed the excessive force Chicago police officers inflicted on Andrew Wilson in 1982 and the greater systematic abuse at Area Two during that time. The Goldston report concluded:

> In the matter of alleged physical abuse, the preponderance of the evidence        is that **abuse did occur and that it was systematic**. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating but went into such esoteric areas as psychological techniques and planned torture. (emphasis added).

87. As referenced above, *in 1999* U.S. District Judge Milton I. Shadur found that it was *undisputed* that Chicago police officers tortured suspects and obtained false confessions around the time that Maxson was arrested:

> It is now **common knowledge** that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him **regularly engaged in the physical abuse and torture of prisoners to extract confessions**. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that **those beatings and other means of torture occurred as an established practice, not just on an isolated basis**. *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999). (emphasis added).

88. In response to mounting public outcry and a petition requesting an investigation into the many allegations of torture, Paul Biebel, the Presiding Judge of the Criminal Division of Cook County Circuit Court, launched an investigation in 2002 into the many claims of torture at the hands of Chicago police officers.

89. Judge Biebel appointed Edward J. Egan and James D. Boyle as Special Prosecutors to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by the Chicago police officers under the command of Burge at Area Two and Area Three Headquarters in Chicago, beginning in 1973.

90. The resulting Report, released in 2006, highlighted a large number of torture claims and identified many officers, who were accused of physical and psychological abuse of individual in police custody.

91. Maxson has consistently maintained that the detectives in his case physically and psychologically abused him and coerced him into giving a false confession. The cases below detail chillingly similar claims of abuse leveled against all of Maxson's detectives.

92. Defendant William Marley has been directly involved in many notorious cases involving Jon Burge and other Area 2 detectives. See, e.g., *People of the State of Illinois v. Aaron Patterson, 192 Ill.2d 93 (2000);(1986* false confession procured by Marley, Burge, Pienta and McWeeney, and others. On January 10, 2003, Patterson was granted by Governor George H. Ryan a gubernatorial pardon based on innocence. In 2007, a federal civil rights suit brought against the police by Patterson was settled for $5 million.

93. Marley and Pienta were also involved in the wrongful conviction of Patterson's co-defendant, Eric Caine. *People of the State of Illinois v. Eric Caine. (People v. Caine, 258 Ill. App. 3d 599).* Pienta brought Caine into Patterson's interrogation room and struck Caine in the chest, warning him that he would get the same treatment as Patterson unless he was "cool." Caine spent the night locked in an interrogation room at Area Two headquarters.While interrogating Caine the next day, Madigan, a detective in the case, began describing the murders. For a

long period of time, while Caine remained silent, Madigan repeated key points of the confession that he wanted Caine to recite. Shortly thereafter, Madigan presented Caine with his notes for Caine to study and so that he could sign them as his own statement. When Caine refused to sign the false confession, Madigan struck Caine with a cupped hand on the side of his head. Caine heard a loud pop and felt a rush of pain. Caine cried out and doubled over in agony, as Madigan tried to quiet him. The strike to Caine's head ruptured his eardrum. On March 16, 2011, 25 years after his conviction, the State of Illinois dismissed all charges against Caine and Cook County Circuit Court Judge William Hooks ordered his release. In July 2013, Caine settled a federal lawsuit against the Chicago Police Department for ~~$10~~ millions of dollars.

94. In 1990, Defendants Marley, Duffy and Detective Dwyer and fellow longtime Burge subordinate Pienta were all involved in the Area 2 torture of Shawn Whirl. *People v. Whirl*, 2015 IL App (1st) 111483. After Duffy and Dwyer interviewed Whirl, they left him in an interview room for Pienta, who tortured Whirl into a false confession. Pienta slapped Whirl as he repeatedly denied involvement in the murder. Noticing Whirl had a wound on his leg, Pienta then stepped on Whirl's foot and scraped the wound on his leg with a key until a false confession was obtained. Whirl was granted a new trial in 2015, released shortly thereafter and now has settled a 1983 claim for millions of dollars for the torture inflicted upon him.

95. In *People v. Baker*, 253 Ill. App. 3d 15 (1st Dist. 1993), the Appellate Court reversed a murder conviction holding that detectives James Pienta and William Marley, in 1986, improperly reinitiated contact with a mentally ill defendant after he had invoked his fifth amendment right to counsel.

96. In *People v. Everett*, 228 Ill. App. 3d 1054 (1st Dist. 1992) Everett alleged that during

questioning for a 1987 murder he was not allowed by Detective Defendant John Duffy to use

the bathroom, drink water or contact his attorney. He claimed that the officers did not allow

him to telephone his attorney because he refused to give a statement. Questioning ceased

sometime between 5 and 6 p.m., and Everett was then taken to lock-up. Defendant alleges

that he was not given any food. He also alleges that he was not allowed to make a telephone

call until 1 a.m. the next morning.

**D. THE TORTURE, ARREST, WRONGFUL CONVICTION AND INCARCERATION OF
MARK MAXSON COULD NOT HAVE BEEN ACCOMPLISHED WITHOUT THE
DIRECT ASSISTANCE AND KNOWLEDGE OF A LARGE NUMBER OF UNSUED CO-
CONSPIRATORS WHO FOR DECADES, BY THEIR ACTIONS AND INACTIONS,
RATIFIED THE BEHAVIOR DESCRIBED IN THIS COMPLAINT.**

97. From 1981 through 1989 unsued co-conspirator Richard M. Daley was the State's Attorney

of Cook County and during that period was responsible for the policies, practices and

customs of that office. From 1989 to 2011, Daley was the Mayor of the City of Chicago and

as such was a chief policymaker for the City of Chicago, its Police Department, City Council,

and Police Board and was and is therefore responsible for the policies, practices, and customs

complained of herein.

98. From 1982 through August of 1986, unsued co-conspirator Jon Burge was a duly appointed

and sworn Chicago Police Lieutenant and was, the commanding officer of Chicago Police

Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3

Detective Division by Superintendent Leroy Martin and held this assignment until November

of 1991, when he was suspended and, ultimately, fired by the Chicago Police Department for

the torture and abuse of Andrew Wilson. Burge engaged in a pattern and practice of torture

and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to Area 2 detectives named herein. On June 28, 2010, Burge was convicted of perjury and obstruction of justice for falsely denying that he participated in, was aware of and supervised police torture.

99. Unsued co-conspirator John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 toAugust of 1986, and supervisor of the Unit's notorious midnight shift, also known as the 'A Team," who also worked on the midnight shift of the Area 2 Violent Crimes Unit. Byrne, like Burge, engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives.

100. In 1983 and early 1984, unsued co-conspirator Leroy Martin was the Commander of Area 2 and Jon Burge's direct supervisor, and from 1987 to 1992, he was the Superintendent of Police for the City of Chicago, and as Superintendent was responsible for the policies, practices, and customs complained of herein.

101. From 1990 to 1998, unsued co-conspirator Gayle Shines was the Director of the Office of Professional Standards of the Chicago Police Department, appointed by Mayor Richard M. Daley. As such, she implemented the policies, practices and customs of the CPD with regard to discipline. Her direct supervisor was the Chicago Police Superintendent.

102. From 1998 to 2002, unsued co-conspirator Thomas Needham was counsel to, and administrative assistant for, Superintendent Terry Hillard, who was his direct supervisor, and, as such, implemented the policies, practices and customs alleged herein.

103. In February 1982, the Superintendent of the Chicago Police Department, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed ~~Defendant~~ Commander Jon Burge in charge of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African-American citizens, including Donald White, Anthony Williams, Lamont White, Walter White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry Milan, and abused and terrorized a large number of other African-American citizens.

104. In the early morning hours of February 14, 1982, Burge and numerous Area 2 detectives, arrested Andrew Wilson for the police officer murders. That morning and throughout that day, Burge and other Area 2 detectives tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears, and other parts of the body with a black electric shock box and a plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating. States Attorney Daley, the then Mayor of the City of Chicago Jane Byrne, and the then Superintendent of the Chicago Police all closely monitored developments in the manhunt. All three learned from numerous sources about the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and his brother Jackie Wilson, and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

105. As a direct and proximate result of the failure of Daley, Leroy Martin and their successors to intervene, to discipline and to adequately supervise, Burge and other Area 2 Detectives tortured numerous additional almost exclusively African American suspects with electric

shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of 1982 to April of 1990. The victims in this period included the following men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Bobby Joe Williams, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Lee Norah, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, James Billingsley, Stanley Howard, Dwight Cavin, Alphonso Pinex, Thomas Craft, Lavert Jones, Alex Moore, Terry Harris, Lonza Holmes, Mearon Diggins, Michael Tillman, Stephen Bell, Eric Caine, Aaron Patterson, Darrell Cleveland, Terrence Houston, David Randle, Richard Terrell, Andrew Maxwell, Jerry Thompson, Donald Torrence, Madison Hobley, Jeffrey Howard, Curtis Milsap and Ricardo Rodriguez.

106. Defendant detectives in Plaintiff Maxson's case concealed from Plaintiff and his counsel, the trial, appellate and post-conviction prosecutors, and the judges in Plaintiff's criminal proceeding, all of the facts regarding this extensive pattern of abuse and torture of African American men. Defendant detectives also concealed the physical implements of the pattern and practice of torture, including cattle prods, electric shock box, plug-in electrical device, plastic bags, typewriter covers, blackjacks, rubber truncheons, telephone books, shotguns and handguns used by Burge and other Area 2 detectives against numerous other victims of their pattern and practice of torture.

107. By no later than February 1982, co-conspirator Daley had direct, personal knowledge that ~~Defendant~~ Commander Jon Burge and other Area 2 detectives committed acts of torture against African American suspects at Area 2. During the February 1982 manhunt described

above, Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2. Daley therefore knew or should have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular, the abuse of the White brothers and Anthony Williams, who were placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Burge and his men perpetrated against them.

108. Co-conspirator Richard M. Daley was also informed of the arrests of Andrew and Jackie Wilson on the morning of February 14, 1982. Throughout the day of February 14, as the Wilsons were tortured (frequently screaming in the course of the abuse), several high ranking Assistant State's Attorneys were present at Area 2. An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, Larry Hyman, participated directly in the interrogation of the Wilsons, which occurred between sessions of torture at the hands of Burge and his men. The high ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that the Wilsons were being tortured. Those high ranking assistants were reporting directly to Daley and to the First Assistant State's Attorney at the time, Richard Devine. Neither Daley nor any of his top assistants did anything to halt or prevent the torture of the Wilsons.

109. On or about February 17, 1982, Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that the medical examination of Andrew Wilson revealed unmistakable evidence that Wilson had been brutalized while in police custody, and that Wilson reported being tortured with electric shock. In this letter, Dr. Raba demanded an investigation. After conferring

with high ranking police command personnel, the Superintendent wrote a letter to unsued

co-conspirator Daley, enclosing the Raba letter and advising Daley that, in light of the

pending prosecution of Wilson, the Superintendent would not investigate or otherwise

pursue the matter without instructions from Daley.

110. Co-conspirator Daley received the Brzeczek letter (with its enclosure) and shared and

discussed it with his First Assistant and other high level subordinates. Daley never

responded to the letter.

111. Daley and his subordinates were fully aware that Superintendent Brzeczek's letter set forth

criminal conduct by Burge and other Chicago police detectives and officers, and they knew

or should have known that ASA Larry Hyman might be complicit in this criminal conduct.

They also knew that there was physical, medical, and testimonial evidence which supported

the claim of physical abuse.

112. Not only did Daley fail to instruct the Superintendent of Police to conduct a criminal and/or

administrative investigation, but he also failed to conduct a criminal investigation of his

own, and did not refer the evidence to an independent agency for investigation. Instead, on

information and belief, Daley communicated to Dr. Raba, through Cook County Board

President George Dunne, that Raba "should not get involved" in the Wilson case, and

subsequently, both Daley and the Superintendent issued separate public commendations to

Burge and his men.As a direct result of co-conspirator Daley's refusal to act, the Chicago

Police Department, and its Office of Professional Standards indefinitely suspended all

investigations into the allegations of torture and abuse made against Burge and his men,

both by Wilson and Raba, and by the other African American citizens who were tortured and abused during the manhunt.

113. Throughout the manhunt, the arrests first of the White brothers then of the Wilson brothers, the receipt and discussions of the Brzeczek letter, and the decision not to contact Brzeczek or to investigate, Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

114. This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Daley, no longer exists, and, on further information and belief, was destroyed by Daley.

115. In the period of time between the Wilsons' torture, in February 1982, and when Daley left the Cook County State's Attorney's Office in December of 1988, Cook County prosecutors, under Daley's direction, prosecuted at least thirty African American men who were tortured by Defendant Marley and co-conspirators Burge, Byrne, and other detectives under Burge and Byrne's command and supervision. In none of these cases did Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Andrew Wilson and the specific knowledge of Daley and his high ranking subordinates as to the truth of Wilson's allegations. In none of these cases did Daley request or pursue an investigation into the allegations of torture.

116. Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the Cook County State's Attorney's Office prosecuted during this period of time. There is no more grave and important decision made by the State's Attorney of

Cook County than the decision to seek the death penalty against an accused defendant. Each and every such decision was made personally by the State's Attorney himself after careful review of the case and full consultation with both his high command and the line assistants handling the prosecution.

117. Subsequent to seeking and obtaining the death penalty in Andrew Wilson's case, Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Reginald Mahaffey, Jerry Mahaffey, Michael Tillman, and Steven Bell,—all of whom claimed that they were tortured by Area 2 Lieutenant Burge, Midnight Sergeant John Byrne, Defendant Marley, and/or other Area 2 personnel. On information and belief, Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge, Byrne and/or other Area 2 personnel, in some cases using techniques identical or very similar to those Daley knew had been used against Andrew Wilson. Knowing that these individuals all credibly claimed that they had been tortured into confessing, Daley nonetheless decided to seek the ultimate punishment against each of them, in each case declining to pursue any investigation of the involved Area 2 officers and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

118. At the time Daley reviewed the cases set forth in paragraph 79 above and decided to seek the death penalty in each of those cases he (a) had near-certain personal knowledge that Andrew Wilson had been tortured and that numerous other African Americans had been tortured, abused, and terrorized by Burge and his men during the Wilson manhunt; (b) had

personal knowledge that Burge and his Area 2 detectives were continuing to practice

extreme physical abuse and torture against African American suspects; and (c) personally

knew of exculpatory information regarding the pattern of torture, which he had deliberately

concealed since February 1982. Daley nonetheless decided to seek the ultimate punishment

against these African American men without pursuing any investigation of their allegations

and deliberately failing to disclose the exculpatory information in his personal possession

and in possession of the Office of the Cook County State's Attorney

119. Leroy Martin was the Commander of Area 2 in 1983 and early 1984, and was Burge's direct

supervisor. At that time, Martin learned that his Violent Crimes Lieutenant Jon Burge, his

Midnight Sergeant John Byrne, and detectives under their command, systematically

tortured and abused numerous African American suspects, including Andrew and Jackie

Wilson, Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey,

Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton. Martin

failed to initiate appropriate investigations or to discipline Burge, Byrne, Marley, or any

other Area 2 officers in connection with any of these cases.

120. In 1987, Martin was named Superintendent of the Chicago Police Department. As

Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2

Commander, Martin continued to fail to intervene, to supervise, discipline or otherwise act

to prevent the ongoing misconduct of Burge and his men. Following Plaintiff's torture and

wrongful conviction, Martin worked actively to conceal and suppress evidence of the

pattern of torture, as is fully alleged below.

121. Following his arrest in 1992 and his conviction in 1994, Plaintiff languished in prison until 2016, when he was exonerated after DNA testing revealed the identity of the actual murderer.

122. Plaintiff's exoneration was delayed and his imprisonment and wrongful conviction lasted far longer than it otherwise would have because, for many years, Daley, Martin, Hillard, Needham and Shines, in conspiracy amongst themselves and with others, including Defendants Marley, Pesavento, Dwyer and Duffy and co-conspirators Burge, Byrne, their police confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

123. In 1989, co-conspirator Daley became the Mayor of the City of Chicago. In that capacity he was directly responsible for the appointment of the Superintendent of the Chicago Police Department. Daley also had ultimate responsibility for the operations of the Police Department. Daley therefore had the duty to take all necessary steps to ensure that the Department and its officers disclosed exculpatory information to all victims of co-conspirators Burge, Byrne, and their Area 2 confederates, including Defendant Marley. In addition, Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Daley had become personally aware while he was State's Attorney of Cook County.

124. Co-conspirator Daley, while Mayor 1) did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County, until

he left the Mayor's office in 2011; 2) did not intervene at any time to direct the Chicago Police Department to disclose exculpatory information in its possession regarding Burge; and 3) did not direct the CPD to conduct a thorough and aggressive investigation of Burge, Byrne, Marley, and the other detectives who abused African American men while working under Burge's command.

125. Rather than disclose exculpatory material and conduct appropriate investigations, co-conspirators Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the Chicago Police Department to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge. Their actions in this regard included, but are not limited to those alleged above and below.

126. In 1990 a report was prepared by Chicago Police OPS investigator Michael Goldston, which found that there was systematic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse, and encouraged it, by actively participating or failing to take action to stop it. In 1991, the Goldston Report was supplemented with a finding that Burge, Byrne, and several other Area 2 detectives were prime movers in this pattern of abuse, and that Burge and two of his subordinates had tortured Andrew Wilson.

127. In a companion Report, the "Sanders Report", the OPS found that Burge and these same two subordinates tortured Andrew Wilson and recommended that they be fired.

128. Co-conspirator Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and

conclusions set forth above, inter alia, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

129. Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing the findings that there was systematic abuse at Area 2, which implicated Martin, Burge, Byrne, and other Area 2 detectives who worked under Burge's command.

130. The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

131. On or before February 7, 1992, Mayor Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel. Daley knew or should have known that Martin had been the commanding officer at Area 2 and Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

132. Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Daley: 1) did not seek an independent federal investigation; 2) direct Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or 3) seek the prosecution of Burge and his confederates.

133. Instead, in a joint effort with Superintendent Martin, Mayor Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was, *inter alia*, to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

134. Even after learning of the findings in the Goldston Report, Martin, OPS Director Gayle Shines, and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against ~~Defendant~~ Commander Jon Burge.

135. From 1989 to 1992, Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

136. In January of 1992, Martin admitted in a publicly filed pleading that an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

137. In February 1993, the Chicago Police Board fired Burge for torturing Andrew Wilson. These findings became final in December 1995.

138. In 1993, the OPS re-opened investigations into approximately ten Area 2 torture cases. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman sustained numerous allegations that Sergeant Byrne and Area 2 Detective Peter Dignan racially abused and tortured Darrell Cannon with the cattle prod. OPS supervisor Carmen Christia reviewed the findings and approved them.

139. The OPS also entered sustained findings of torture and abuse against Byrne and Dignan in five other re-opened cases, including that of Gregory Banks and Stanley Howard.

140. From 1993 until 1998, co-conspirator Shines (who had previously been appointed by Mayor Daley) under pressure from her fellow co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

141. In 1998, co-conspirator Superintendent Terry Hillard and his administrative assistant Thomas Needham, with full knowledge that Area 2 detectives had participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate OPS Director Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

142. On information and belief, Daley also personally insisted, from the time he became Mayor in 1989 until he was succeeded in 2011, that the City of Chicago continue to finance the defense of Burge, Byrne and their accused colleagues and subordinates, despite his personal knowledge that they had committed acts of torture against African American men while

employed as Chicago Police officers and/or supervised and condoned such acts. Daley's

insistence on defending Burge was contrary to the recommendation of Daley's senior staff

that the City sue rather than defend Burge, and continued throughout Daley's tenure as

Mayor, despite Burge's indictment in October of 2008 for perjury and obstruction of

justice, and his conviction on these charges on June 28, 2010.

### E. PLAINTIFF'S CONVICTION WAS OBTAINED AND HIS ULTIMATE EXONERATION WAS DELAYED FOR DECADES DUE TO THE CONDUCT DESCRIBED IN THIS COMPLAINT.

143. The concealment, obstruction and suppression of exculpatory information and continuing

failure to investigate or discipline described above materially and significantly continued

the wrongful conviction of Plaintiff, substantially delayed Plaintiff's exoneration, and

caused Plaintiff to face many additional years of unjust incarceration that he would not

have endured if the obstruction, suppression and concealment had not occurred.

144. On September 27, 2016, the prosecution dismissed all charges against Plaintiff in a manner

indicative of innocence, and on that very same date, Plaintiff was released from prison.

### 145. F. THE MISCONDUCT OF THE DEFENDANTS NAMED HEREIN WAS COMMITTED IN THE FURTHERANCE OF A CONSPIRACY TO TORTURE AFRICAN AMERICAN CITIZENS IN THE CITY OF CHICAGO AND TO GO TO GREAT LENGTHS TO CONCEAL SUCH UNLAWFUL CONDUCT.

146. Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer, acting jointly

and with other police and prosecutorial investigative, supervisory, and command personnel,

including Sergeant Lawrence Augustine, and those specifically named as co-conspirators in

this complaint, together reached an understanding, engaged in an ongoing course of

conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.

147. This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below, and has continued to the present, as evidenced, *inter alia*, by the false testimony and statements denying torture given by these Defendants and their fellow officers; false statements and testimony of Commander Burge and co-conspirator and former Area 2 detective Michael McDermott, and various other police and assistant state's attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in *U.S. v. Jon Burge*; and by false public statements concerning police torture made by, inter alia, coconspirators Daley, Burge, Byrne and Richard Devine, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment, and in June of 2010 in response to Burge's conviction, and in 2015 in response to the passing by the Chicago City Council of the Reparations Ordinance.

148. By and through the aforementioned overt acts, together with those set forth above, each and every defendant and co-conspirator jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived and continues to deprive Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement and imprisonment and the excessive use of force; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### G. PLAINTIFF HAS SUFFERED IMMEASURABLE DAMAGES AT THE HANDS OF THE NAMED DEFENDANTS AND UNNAMED CO-CONSPIRATORS WHO CONTRIBUTED TO HIS WRONGFUL INCARCERATION FOR A QUARTER OF A CENTURY.

149. Plaintiff spent 24 years in prison for a crime he did not commit. This time can not be given back to him. Plaintiff has suffered numerous beatings and 24 years of hatred and derision from other inmates after being wrongfully labeled by defendants as a child rapist and killer. Plaintiff also suffered from the loss of sustained contact with members of his family, and was prevented from holding gainful employment or pursuing educational opportunities outside of the penitentiary walls. He continues to live under the under the stigma of his wrongful conviction.

### COUNT I

### 42 U.S.C. § 1983 Claim for Deprivation of a Fair Trial and Wrongful Conviction

150. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

151. In the manner set forth more fully below, Defendants Duffy, Marley and Pesavento, individually, jointly, along with Detective James Dwyer and Lawrence Augustine, and in conspiracy with each other and the other named and unsued co-conspirators, caused the wrongful charging, prosecution, conviction, and imprisonment of Plaintiff and the continuation of that wrongful conviction.

152. These Defendants and unsued co-conspirators caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physical coercion, psychological coercion, constructing and/or fabricating the false and totally unreliable statements and admissions

which formed the basis for Plaintiff's prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these statements and admissions were false, totally unreliable, constructed, fabricated and coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and other evidence, including, but not limited to, other acts of torture and abuse that they participated in, the instruments of torture, as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; by destroying evidence and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right not to be wrongfully convicted, as guaranteed by the U.S. Constitution.

153. Additionally and/or alternatively, Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Sgt. Lawrence Augustine, failed to intervene to stop Plaintiff's wrongful prosecution and conviction and resultant imprisonment despite having the opportunity and duty to do so.

154. The actions and inactions of Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Lawrence Augustine, in depriving Plaintiff of his right not to be wrongfully charged, convicted and imprisoned, and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

155. Additionally and alternatively, these actions were done maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights and shock the conscience of a decent and civilized society.

WHEREFORE, Plaintiff demands judgment against Defendants Duffy, Marley and Pesavento for a sum of thirty-six million dollars in compensatory damages and reasonable punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II

### 42 U.S.C. § 1983 Claim for Coercive Interrogation

156. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

157. The actions of Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Lawrence Augustine, individually, jointly, and in conspiracy with each other in coercively interrogating Plaintiff, and in using torture techniques which "shock the conscience" during said interrogations, resulted in false, coerced, and fabricated admissions that were subsequently used against him in his criminal proceedings, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

158. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

159. The actions of Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Sgt. Lawrence Augustine, in using torture and other coercive techniques to interrogate Plaintiff, and/or in devising, encouraging, facilitating, condoning and permitting the use of

said techniques, and failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Duffy, Marley and Pesavento for thirty-six million dollars in compensatory damages and reasonable punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT III

### 42 U.S.C. §§ 1985, 1986 Claim for Conspiracy

160. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

161. Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Sgt. Lawrence Augustine, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

162. Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated

conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

163. Additionally and alternatively, these actions were done maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

164. Additionally or alternatively, Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Lawrence Augustine, knowing that the above § 1985 conspiracy to torture and wrongfully convict Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

WHEREFORE, Plaintiff demands thirty-six million dollars in compensatory damages and reasonable punitive damages, jointly and severally, from Defendants Duffy, Marley and Pesavento, plus attorneys' fees, the costs of this action and whatever additional relief this Court deems equitable and just.

## <u>COUNT IV</u>

## <u>42 U.S.C. § 1983 Monell Policy Claim Against the City of Chicago</u>

165. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

166. The actions of Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Lawrence Augustine, as alleged above were committed pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Chicago.

167. At all times material to this complaint, the Defendant City of Chicago through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or

Corporation Counsel's Office had interrelated de facto policies, practices, and customs which included, inter alia:

a. conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Leroy Martin, Jon Burge and John Byrne at Area 2;

b. the filing of false reports, and giving false statements and testimony about said interrogations and confessions and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 detectives;

c. the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

d. the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise

illegally or improperly coercively questioning or interrogating witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. This failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

e. the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal and civil cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques at Area 2 were employed. An egregious example of this code of silence in the torture cases is evidenced and was invoked in response to the Government's investigation and prosecution of Jon Burge and the investigation of

other Area 2 officers under his command and supervision;

f. covering up and suppressing evidence and findings, refusing to properly

investigate, arrest and charge, continuing to finance the defense of Jon Burge, and other

Area 2 detectives and otherwise attempting to both publicly and judicially defend their

actions even after Burge had been indicted and convicted for lying about these acts,

and otherwise obstructing justice in police torture cases, particularly those that arose at

Area 2.

168. The pattern and practice of torture and abuse at Area 2, the cover-up of that abuse and the

wrongful prosecutions and convictions which resulted therefrom, were well known within

Area 2 well before Plaintiff was tortured and wrongfully convicted, including by the

command officers at Area 2, which included Jon Burge and Leroy Martin, and Burge's

successor, Phil Cline, as well as to former Chicago Mayors Jane Byrne and Richard M.

Daley and their Chiefs of Staff, successive Police Superintendents, including Richard

Brzeczek, Fred Rice, Leroy Martin, Matt Rodriguez, Terry Hillard, and Phil Cline, to the

successive OPS Directors, including Gayle Shines, and Callie Baird, to various Command

Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, to the

Chiefs of Detectives, including William Hanhardt and Terry Hillard, to the Chicago City

Council and the Chicago Police Board, and to other policy making, command, and

supervisory City and police personnel, who participated in the cover-up and suppression of

evidence, the wrongful prosecution and conviction of the Plaintiff and other torture victims,

and the denial of their full and fair access to the courts, inter alia, in the manner set forth in

this complaint.

169. Said interrelated policies, practices and customs, as set forth above, both individually and

together, were maintained and implemented with deliberate indifference; they encouraged,

inter alia, the coercing of statements from suspects, witnesses and arrestees, by torture and

related abusive tactics and techniques, the construction and fabrication of confessions,

admissions, statements, and other false witness evidence, the suppression and destruction of

evidence of torture and other exculpatory evidence, the intimidation of witnesses, the

making of false statements and reports, the giving of false testimony, the obstruction of

justice, the manipulation and obstruction of the State and Federal courts, and the pursuit

and continuation of wrongful convictions and false arrests and imprisonments; and were,

separately and together, a moving force behind, and a direct and proximate cause of, the

unconstitutional acts and perjury committed by the named Defendants and their co-

conspirators, and the injuries suffered by the Plaintiff.

170. Additionally, the City of Chicago's said failure to properly train, discipline, monitor,

control, assign, transfer, supervise, and counsel Defendants Dwyer, Duffy, Marley and

Pesavento who were involved in numerous other acts of torture and abuse, was also done

with deliberate indifference and likewise acted as a direct and proximate cause of the

injuries to Plaintiff.

171. Additionally, and/or alternatively, the involvement in, and ratification of, the

unconstitutional actions set forth above, by Chicago governmental and police policymakers,

acting in their official capacities, as set forth in detail in the facts above, including, but not

limited to, successive Police Superintendents, including co-conspirators Leroy Martin and

Terry Hillard, and their direct subordinates, including, but not limited to, Gayle Shines and

Thomas Needham, and several Mayors, most notably Mayor Richard M. Daley, who continued to publicly both ratify, and deny his involvement in, said conduct until he left office in 2011, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for thirty-six million dollars in compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V

### State Law Claim for Malicious Prosecution

172. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

173. Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer, and Sgt. Lawrence Augustine, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, individually, jointly, and in conspiracy, continued said prosecution, again without probable cause. As described above, said prosecution was ultimately terminated in Plaintiff's favor and in a manner indicative of his innocence. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Duffy, Marley and Pesavento for thirty-six million dollars in compensatory damages and reasonable punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT VI

### State Law Claim for Conspiracy

174. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

175. Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Sgt. Lawrence Augustine,, with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in, and continue to engage in, a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and/or continue said prosecution, and to intentionally imprison Plaintiff.

176. In furtherance of this conspiracy, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

177. Said conspiracy and overt acts were, and are, continuing in nature.

178. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to maliciously prosecute innocent defendants, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Duffy, Marley and Pesavento for thirty-six million dollars in compensatory damages and reasonable punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT VII

### State Law Respondeat Superior Claim

179. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

180. Defendants Duffy, Marley and Pesavento, along with Detective James Dwyer and Sgt.

Lawrence Augustine, were at all times material to this complaint, employees of the

Defendant City of Chicago, acting in the course of their employment.

181. Defendant City of Chicago, as principal, is responsible for the acts of its employee/agents

committed in the course of their employment.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for 36

million dollars in compensatory damages, plus costs and attorneys' fees and whatever additional

relief this Court finds equitable and just.

## COUNT VIII

### 745 ILCS 10/9-102 and Common Law Claims Against the City of Chicago

182. Plaintiff re-alleges all of the paragraphs set forth in this complaint.

183. Defendant City of Chicago was the employer of Defendants Duffy, Marley and Pesavento,

along with Detectives James Dwyer and Sgt. Lawrence Augustine, at all times relevant and

material to this complaint.

184. These Defendants committed the wrongful acts alleged above under color of law and

in the scope of their employment as employees of the City of Chicago.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to

law, demands judgment against the Defendant City of Chicago in the amounts awarded to

Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

Dated: November 17, 2023

Respectfully Submitted,

*/s/ Elliot R. Zinger*
Elliot R. Zinger, Esq.


*/s/ Larry M. Dreyfus*
Larry M. Dreyfus, Esq.


ELLIOT R. ZINGER, Esq.
Elliot R. Zinger & Associates, P.C.
2040 North Harlem Avenue
Elmwood Park, Illinois 60707
(312) 782-9464

Larry M. Dreyfus, Esq.
Attorney At Law
102 Camino Barranca
Placitas, New Mexico 87043
(505) 301-1933